## In re WAGGONER

### (206 N. W. 427.)

#### (File No. 5564. Opinion filed December 9, 1925.)

1.   **Attorney and Client—State's Attorney—State's Attorney, Accepting Reward for Recovering Stolen Property and Assisting Deputy Sheriff in Recovering Similar Reward, Held Guilty of Unprofessional Conduct.**

Acts of state's attorney in accepting reward for recovering and returning stolen property and in assisting deputy sheriff, who, under Rev. Code 1919, Sec. 3691, is prohibited from receiving reward for doing any official act, is also securing reward for similar services, held unprofessional conduct.

2.   **Attorney and Client—Admissions—Defense Interposed by Attorney in Disbarment Proceedings Held Unethical and Unprofessional.**

Attorney in disbarment proceedings, who admitted that he requested sheriff to allow prisoner to .be taken to another state, and himself transported such prisoner, who escaped while in such other state, is guilty of unethical and unprofessional conduct in interposing defense that prisoner was not legally held by sheriff because legal commitment had not been issued.

3.   **Attorney and Client—Unprofessional Conduct—Attorney Inducing Sheriff to Permit Prisoner to be Taken Out of State Late at Night, Guilty of Unprofessional Conduct.**

Act of attorney in inducing sheriff to allow attorney to take prisoner out of state and into neighboring state to point which could not be reached until late at night, and from whence prisoner escaped, held improper and unprofessional conduct.

4.   **Attorney and Client—Disbarment—Attorney Held Guilty of Unprofessional Conduct in Beginning Criminal Action to Procure Property Settlement and Divorce for Client.**

Evidence held to show that attorney began criminal prose-
cution as part of an attempt to procure a property settlement
and a divorce for his client, and later offered to compromise
prosecution, which acts constituted unprofessional conduct,
notwithstanding Rev. Code 1919, Sec. 4803, permits compro-
mise of misdemeanors.

5.  Evidence—Judicial Notice—Judicially Noticed That Successful
    Prosecution of Criminal Actions Not Proof of Proper Ethical
    Standards.

Court, in disbarment proceedings against attorney, who at
one time was state's attorney, takes judicial cognizance of fact
that successful prosecution of criminal actions is not proof of
proper ethical standards.

Proceeding for the disbarment of L. E. Waggoner, attorney
at law. Accused suspended for three months.

*Buell F. Jones,* Attorney General, and *Benj. D. Mintener,*
Assistant Attorney General, for the Prosecution.

*L. E. Waggoner, B. O. Stordahl,* and *George J. Danforth,* all
of Sioux Falls, for Accused.

MORIARTY, C. This proceeding was instituted in this court
for the disbarment of L. E. Waggoner, heretofore admitted by
this court to the practice of law in the courts of this state.

The accused made his first appearance herein by interposing
three demurrers to the three separate charges contained in the
complaint. After hearing upon said demurrers ,this court made
an order overruling each of said demurrers and allowing the
accused time to answer. An answer was duly served and filed,
raising issues of fact upon the allegations of the complaint. And
Hon. R. F. Williamson, of Aberdeen, an attorney of this court,
was by the court appointed a referee to hear the evidence and to
report the same to this court, with his findings of fact and con-
clusions of law made upon such evidence. The said referee has
presented to the court a transcript of the evidence taken before
him and has submitted therewith his findings of fact and conclu-
sions of law, and the matter now comes before the court upon
such report of the referee.

In the decision upon the demurrers (47 S. D. 401, 199 N. W.
244), this court fully defines the law of this state, in so far as the
offenses alleged in the complaint are concerned, and it also modi-
fies to some extent expressions made in Re Bartlett et al, 47 S. D.

208, 197 N. W. 285, as to the standards of professional conduct to be required of members of the bar of this state.

The law of the case being thus defined, the only questions before the court at this time are the questions of fact covered by the evidence, and whether the evidence supports the findings and conclusions of the referee. In considering these questions the court must be influenced by recognizing the very serious effects of disbarment, and at the same time by the necessity of preserving high standards of legal ethics so that practicing attorneys shall understand that they are to measure their conduct not by an effort to merely avoid being guilty of lawbreaking "beyond any reasonable doubt," but by avoiding "even the appearance of evil" and refraining from the doing of any act which raises in their own minds serious doubts of its propriety.

Three separate charges are made in the complaint and are covered by the report of the referee: (1) The acceptance of a reward in the Gutmann Robbery Case. (2) Misconduct in the Carl Schmahl Case. (3) Misconduct in the Prisch Case.

A statement of the nature of each of these charges will be found in the decision on the demurrers, above cited, and it is unnecessary to extend this opinion by a repetition thereof.

The evidence shows, beyond dispute, that the accused did accept one-third of a reward of $1,800 paid for the return of certain jewelry stolen from the Chicago, Milwaukee & St. Paul depot at Sioux Falls, and recovered by the efforts of the accused and others. This $600 was received by the accused before he had rendered any services to any one except such as he appeared to perform as state's attorney of Minnehaha county, engaged in an effort to secure the evidence required to convict the persons guilty of the theft of the jewelry. After accepting this $600 the accused went to Cincinnati, Ohio, to secure a final settlement from the parties offering the reward for the recovery of the stolen jewelry. At Cincinnati he received a further payment of $350, of which he paid $181 to one Hugo Karl, who claimed to be entitled to a share of the reward. The remaining $169 of this payment he kept to reimburse him for the expenses of the trip. After receiving the $600, and before starting for Cincinnati, he made an agreement with Julius Wold and S. B. McCauley, the men who have received the remainder of the $1,800, whereby these men

agreed that the accused should represent them in the matter of adjusting the amount of the reward and securing settlement thereof, and for such services should have an equal share with themselves in any and all rewards recovered in the matter. It appears that after the making of this agreement neither Wold or McCauley received any other or further reward, and that the $600 each which they then had was all that either of them ever received from the transaction. The evidence further shows that before accepting the $600 the accused had felt some doubts as to his right to accept any part of the reward. He had consulted an older and more experienced attorney, he and his law partner had examined authorities as to the question, and the accused says that they found nothing to convince them that there would be any impropriety in his accepting part of the reward. Yet he says that when the time of actual receipt of the $1,800 arrived he told Wold and McCauley that he would not take any part of it, and then Wold and McCauley retired to another room and talked it over, and came back and said an attorney should go to Cincinnati to make the final settlement, and if the accused would represent them there he could have an equal share with themselves in all rewards recovered. And he then went to Cincinnati as their representative. The accused says that he thought he ought to be "overly careful" to see that everything was all right about taking this reward, because he knew that he had a lot of enemies in Sioux Falls, "and it would not take much of an excuse for some one to start something." Considerable space in the record is occupied with the question whether the jewelry surrendered for the reward was used as evidence in the prosecutions of persons who were tried for the theft of the goods. But this question is rendered unimportant by the fact that after the recovery of the jewelry two of the men who were arrested entered pleas of guilty and acted as witnesses for the state in the prosecutions of the others. It is quite evident that without the finding of part of the property at places indicating guilt of these men, the pleas of guilty could not have been secured, nor their evidence used to convict the others.

From the evidence thus epitomized the referee deduces the following conclusions of law:

"(1) That the accused received a part of the reward offered

in payment of legal services rendered to Julius Wold and S. B. McCauley, and not for prosecuting any criminal action.

"(2)  That it was no part of the accused's duty as state's attorney to recover said jewelry or make the trip to Cincinnati.

"(3)  That in accepting a part of said reward the accused acted in good faith and in an honest belief that he was entitled to the same.

"(4)  That the receipt and acceptance of said reward was legal and ethical and violated no provision of law, and no ethics of the profession and in no manner was intentionally guilty of any professional misconduct."

With these conclusions the court cannot agree.  It is very apparent from the evidence of the accused himself that his employment by Wold and McCauley as their attorney, and giving him an equal share with them in a reward already paid to them, was a mere subterfuge to cover up his taking of a part of the reward, and throw dust in the eyes of those enemies that were liable "to start something."  This very subterfuge casts doubt upon the good faith of his acts.  If the accused really believed that he had a legal and ethical right to accept part of the reward, why should he tell the others that he would not take the share offered him?  If he was barred from taking any of the reward directly, upon what theory could he act for himself and others in collecting the reward for one-third and his expenses?

The record further shows that Julius Wold, who took a share of the reward, was at that time a regular deputy sheriff of Minnehaha county.  Therefore he was one of the executive officers referred to in section 3691 of the Revised Code.  This section prohibits any such officer from receiving any gratuity or reward for doing any official act, excepting such as may be authorized by law.  For what did Wold receive this reward?  Evidently not for the mere surrender of the property.  If it belonged to the parties who paid the reward, and was no longer required as evidence, they were entitled to the surrender of it without such payment.  If it did not belong to them, or if it was needed as evidence, neither Wold nor the accused had any right to surrender it to them.  Evidently it was for searching for and securing the property that the payment was made.  But during the time he was making such search Wold was specially directed by his prin-

cipal, the sheriff, to devote his time to this jewelry robbery case, and during part of the time, at least, he was armed with search warrants to search for this property. Under such circumstances Wold was not entitled to accept any reward for searching for or receiving the jewelry. "The principle is well settled on considerations of public policy, that an officer cannot lawfully receive or recover a reward for the performance of a service which it is his duty to discharge." 23 Ruling Case Law 1126, and cases there cited. The accused, acting as state's attorney, is presumed to have known this. He had no more right to represent Wold in securing the reward than he had to take it himself.

The conditions revealed by the evidence, showing a deputy sheriff of the county and his legal adviser conspiring to share in a reward which neither could legally accept, call for even stronger condemnation than that expressed on this phase of the case in the decision on the demurrers. The case against the accused is made graver by his attempted defense on this charge.

[1] The conclusions of law submitted by the referee on this first charge are rejected by the court, and in lieu of the findings and conclusions so submitted, the court finds:

"(1) That while acting as state's attorney of Minnehaha county the accused received the sum of $600 as reward for services rendered in recovering certain stolen property which was being searched for by officers of said county as part of their official duties in attempting to apprehend and convict persons who had committed a felony within said county.

"(2) That while acting as such state's attorney he acted for, and in collusion with, one Julius Wold, a deputy sheriff of said Minnehaha county, in securing for said Wold a reward in the sum of $600 paid to said Wold for performing services in recovering stolen property, which it was the official duty of said Wold to search for and recover."

And from such findings of fact this court concludes:

"That in accepting part of such reward, and in representing and assisting said Julius Wold in securing $600 of such reward, the accused acted in violation of law, and violated the ethics of the legal profession."

As to the charge in the Carl Schmahl Case, the evidence introduced shows the facts to be exactly as set forth in the com-

plaint and in the statement contained in the decision on the demurrers. To this charge the accused has interposed three separate items of defense:

First. That when Schmahl was taken to Minnesota by the accused and the deputy sheriff, said Schmahl was being held by the sheriff without legal authority or commitment, because the magistrate before whom Schmahl was brought upon the warrant of arrest never issued any legal commitment.

Second. That the accused did not urge the sheriff to allow Schmahl to be taken out of the state, but merely requested the accommodation and offered to pay $25 for the services of the deputy in good faith as a reasonable compensation for the service, and that throughout the transaction accused acted in good faith, for the sole purpose of attempting to secure bail for his client.

Third. That it was usual and customary in Sioux Falls for the sheriff to accommodate attorneys by allowing prisoners to go out and arrange for securing bail.

As to the first of these defenses, it appears to the court that the accused is peculiarly unfortunate in interposing a defense of this character. A short time before this occurrence the accused had completed his term of service as state's attorney of Minnehaha county. He asked the sheriff to allow him to take a man charged with a felony outside of the state under the custody of a deputy, whose only authority was this commitment. He knew no commitment of a court of this state would give a deputy a right to hold a prisoner in the state of Minnesota. As an attorney and officer of the courts of this state it was the duty of the accused to ascertain that he was not contributing to the chances of a prisoner being enabled to escape from custody. And now he comes before this court defending the ethics of his conduct by saying that he was not to blame, because the prisoner had a legal right to go when he chose to do so.

Were there nothing before this court except this defense, the attitude of the accused as to his being absolved from blame by the fact that the commitment was bad would go far toward convincing the court that the ethical standards of the accused are not those of one entitled to practice in this state.

As to the good faith of accused in taking the prisoner to Minnesota late at night, the accused himself is probably the only

one who knows exactly what he had in mind at that time, but his actions in the matter were perculiar.  He says that Schmahl told him that the only way he could arrange for bail was to get the accommodation from a banker at Lake Benton, Minn.  So the accused took the prisoner and the deputy in accused's own car, and started at 5 o'clock in the evening to make the 100-mile drive to Lake Benton and get a loan from the bank there.  And at about 9 o'clock of an intensely dark December night they arrived at Schmahl's home, and Schmahl has to change his shirt before attending to his business with the bank, and he disappears and is never retaken.  Evidence was introduced to show that it has been customary at Sioux Falls for the sheriff to allow prisoners to go in charge of a deputy or a reputable attorney and attempt to arrange for bail.  But nothing approaching this episode is shown to have taken place there.  There is nothing in the evidence to cause this court to withdraw any of its expressions contained in the decision on the demurrers, so far as this second charge is concerned.  As to this charge the report of the referee contains the following conclusions:

"(1) That the commitment under which the said Carl Schmahl was held by the sheriff was illegal and void and constituted no commitment, and no authority was thereby granted to the sheriff to keep said Schmahl in custody.

"(2)  That by reason of said defective commitment the sheriff was not authorized to hold said Schmahl in jail or elsewhere. ·

"(3)  That the sheriff committed no offense in permitting said Schmahl to go into the state of Minnesota.

"(4)  That the accused acted in good faith in this matter and followed a long established custom in Minnehaha county in so doing, and one which by usage has been sanctioned for many years by the bar of Minnehaha county.

"(5)  That the accused in this matter was not intentionally guilty of any improper or unprofessional conduct."

[2, 3]  With these conclusions this court cannot agree, and said conclusions are rejected, and this court concludes:

"(1)  That, the accused having admitted that he requested the sheriff to allow a prisoner to be taken out of this state and into the state of Minnesota, in the night time and having himself

transported said prisoner and said prisoner having escaped during the time he was in the state of Minnesota, where he was conveyed by the accused, the interposing by the accused of the defense that said prisoner was not legally held by the sheriff of Minnehaha county, is an act of the accused which is unethical and unprofessional.

"(2)   That the act of the accused in inducing the sheriff of Minnehaha county to allow a prisoner to be taken out of this state and into a neighboring state to a point which could not be reached until late at night was an act casting doubt upon the good faith of the accused, and was improper and unprofessional conduct on his part."

[4]   As to the charge of misconduct of the accused in the Prisch Case, the statement contained in the decision on the demurrers does not present exactly the state of facts shown by the evidence, as there is some variation in the record from the allegations of the complaint.   The undisputed facts in this matter are as follows:

During the month of February, 1923, one Grace S. Prisch retained the accused to represent her in the matter of her proposed action for a divorce from her husband, W. J. Prisch. W. J. Prisch had been previously married to one Clementine D. Prisch, and had married Grace S. Prisch only a few months before the accused was so retained.  About February 16, 1923, the accused went to Chicago, and there engaged the services of a private detective agency to secure evidence as to the actions of W. J. Prisch.   It was found that Prisch was then living as a guest in the home of a man named Donat, who had formerly been a business partner of Prisch.  Clementine D. Prisch, the divorced wife of W. J. Prisch, was also a guest at the Donat home.  Clementine D. Prisch was a sister of Mrs. Donat.  A daughter of W. J. Prisch and this divorced wife had been visiting at the Donat home part of the time that her mother was there, but had gone from there before W. J. Prisch came.  Representatives of the detective agency gained access to the Donat home under the pretext of examining the house as a fire risk.  They found that the Donat family occupied the second floor of the building, another family living on the floor below.  In the Donat flat they found Clementine D. Prisch alone; the members of the Donat family

being employed out of the home during business hours. One of the detective force reported to the accused that he and the man working with him had talked with Clementine D. Prisch when they found her alone at the Donat apartments, and that she told them that she and her husband were visiting there. He further reported that there were only two bedrooms in the Donat flat.

When this report was made to him the accused went to the office of the assistant prosecuting attorney at Chicago, and there signed and swore to informations charging W. J. Prisch and Clementine D. Prisch with living in an open state of adultery. Upon these informations these two persons were arrested some time after 9 o'clock at night, and were confined at police headquarters until they secured bail the following day. The evidence shows that Prisch was over 60 years of age, and Clementine D. Prisch was about 60. Both were persons of genteel and respectable appearance, and there is no evidence of any disorderly conduct on the part of either. The evidence of Donat is 'that there were actually three bedrooms in the flat; that Clementine Prisch occupied the bedroom of a 25 year old daughter of Mr. and Mrs. Donat, who was a teacher in the city schools, and that W. J. Prisch occupied a spare bedroom.

On the day after the arrest W. J. Prisch and Clementine D. Prisch gave bail, and the hearing of the cases was continued. At the request of the accused herein, the hearing was set for March 6, about two weeks from the date of the arrest. At the time Prisch and Clementine D. Prisch were brought into court and gave bail, as aforesaid, the accused herein talked with T. Irving Christopher, a Chicago attorney who appeared for Prisch and Clementine D. Prisch, and in reply to a question from Christopher as to whether he was acting in an official capacity or for some private client, the accused said that he was acting for the wife of W. J. Prisch. And when Christopher asked him what his client wanted, whether she wanted them put in jail or. wanted money, the accused said she did not care to put them in jail; that she wanted a divorce and would probably settle. And when asked what settlement she wanted, the accused said that he would have to consult his client as to that. After this conversation, and before the date set for the hearing, the following telegraphic communications passed between Christopher and the accused:

"Sioux Falls, S. Dak. 26 1103A F. W. Christopher Care Winston Strawn and Shaw 1400 First Natl Bank Bldg Chicago Ill. Client will settle Prisch divorce case if defendant will deed Dell Rapids lots pay actual costs of plaintiff support since October first including hospital doctors and nurse bill and attorneys fees and expenses of suit amounting to approximately two thousand dollars period will itemize if considered period offer conditioned upon immediate acceptance also appearance of defendant and consent to immediate trial of divorce case.

"L. E. Waggoner."

"Chicago, February 27, 1923.

"L. E. Waggoner, 201 Beach Parshall Building, Sioux Falls, South Dakota. Your wire says nothing re disposition pending prosecution municipal court stop Client will not discuss settlement property matters until assured this is out of way. Answer. T. Irving Christopher. (Chge. Winston, Strawn & Shaw.) 18-P. W. U. Day Letter (Chge W. J. Prisch.)"

"Sioux Falls, S. Dak. 27 214P

"F. W. Christopher. Care Winston Strawn and Shaw 1400 First Natl. Bank Bldg Chicago Ill. Our client willing to dispose of divorce and criminal cases as suggested in our conversation at court house.                L. E. Waggoner."

'Chicago, February 28, 1923.

"L. E. Waggoner, Beach-Parshall Building, Sioux Falls South Dakota. Client insists it is of first importance to clear name by trial pending charges and refuses to offer any inducement to drop same without trial. T. I. Christopher. (Chge. Winston Strawn & Shaw.) 18-P. W. U. Day letter (Chge W. J. Prisch.)"

At the date set for the hearing, Christopher exhibited these telegrams to the prosecuting attorney and to the court, and the defendants were discharged, the accused, who was the complaining witness, not appearing.

The accused says that he expected to be granted a further continuance, and he wrote a letter, not to the prosecuting attorney or to Christopher, the defendant's attorney, but to one Harrison, the manager of the private detective agency, asking that a further continuance be procured.

As to this charge and upon this evidence the accused contends that he cannot be held to be guilty of any unethical or unprofessional conduct, for the reason that under the laws of Illinois the offense with which W. J. Prisch and Clementine D. Prisch were charged is only a misdemeanor, and any attempt to compromise a misdemeanor is legal under our statutes. And he further says that he did not at any time agree to a dismissal of the criminal actions against Prisch and Clementine D. Prisch, and that said actions were not commenced or prosecuted for the purpose of securing a property settlement or a divorce. And the referee in his conclusions relative to this charge holds with these contentions of the accused, and concludes that the accused was acting in good faith and for the best interests of his client and was not guilty of any unethical or unprofessional conduct in said matter.

With these conclusions of the referee this court cannot agree. Section 4803 does permit persons injured by misdemeanors, under certain conditions, to compromise a misdemeanor. But if there is any statute or code of ethics which permits a practicing attorney to begin a prosecution for the purpose of securing a property settlement in a divorce action this court does not know it, nor would this court recognize any such code of ethics as a proper standard for practicing attorneys of this state. While the accused says that he did not begin the prosecution to secure a settlement, he admits that he told Christopher that he was acting in a private capacity as attorney for Grace Prisch; that his client wanted a property settlement and a divorce; and in the second paragraph of his answer to this charge the accused admits that he told Christopher that possibly his client, Mrs. W. J. Prisch, "might lose interest in the prosecution of the criminal charge after there was a property settlement and her divorce action was disposed of."

This statement was followed up by the telegram demanding the lots in Dell Rapids, $2,000 and immediate trial of the divorce action. And this in turn was followed by the telegram stating, "Our client willing to dispose of divorce and criminal cases as suggested in our conversation at the courthouse." We are unable to reconcile this behavior with any other conclusion except that the accused began the criminal actions as part of an attempt to procure a property settlement and a divorce for his client.

[5] We have no doubt that, in arriving at his conclusions, the referee was greatly influenced by the testimony of many highly respected citizens of Sioux Falls, who testified to the good standing of the accused and his effective services as a prosecuting attorney. This class of evidence is entitled to weight. But this court takes judicial cognizance of the fact that the successful prosecution of criminal actions is not proof of proper ethical standards.

It is undoubtedly true that one who has been a vigorous prosecutor is likely to have the ill will of many of the undesirable members of his community. And it is quite possible that the acts of the accused while prosecuting criminals have caused those who resented those acts to seek for weak spots in his armour. But from whatsoever source the spear may have come, the weak spots in the armour were found.

Bearing in mind the gravity of any punishment that may be inflicted in a case of this kind, as discussed in the opinion of the court in Re Bartlett, 47 S. D. 208, 147 N. W. 285, and also bearing in mind the necessity of insisting upon a high standard of professional conduct on the part of practicing attorneys, as set forth in the opinion on the demurrers in this proceeding, it is the opinion of the court that the conduct of the accused, as shown by the record herein, requires more than a mere reprimand.

And under the provisions of the laws of this state the court deems it proper and necessary to enter its order suspending the accused, L. E. Waggoner, from any and all of the rights of a practicing attorney in the courts of this state, such suspension to continue for and during the full term of three months from and after the service upon said L. E. Waggoner of the said order and the judgment of this court herein.

Judgment will be entered accordingly.

PER CURIAM. Attention is called to the fact that under charges of conduct more unethical, this court, in Re Bartlett and Van Slyke, 47 S. D. 208, 197 N. W. 285, imposed a sentence of mere reprimand and the payment of costs. It is urged that no greater sentence should be imposed in this case. Disabusing our minds of that case, we feel that the sentence of suspension in this case is fairly warranted by the record. We now acknowledge upon further reflection that the sentence of reprimand in that case

was too lenient, but because we then erred is no sound reason for continuing to err.

The above findings and opinion by MORIARTY, Commissioner, are adopted as the findings and opinion of the court.