IN RE COMPLAINT OF BOYLE G. CLARK AND OTHERS, INFORMANTS, v.
B. R. WILLIAMS, RESPONDENT.—128 S. W. (2d) 1098.

Kansas City Court of Appeals. May 29, 1939.

*Clif Langsdale, J. R. Baker, N. T. Cave·* and *Paul M. Peterson* for informants.

*Owen & Thurlo* for respondent.

1178

BLAND, J.—This is an original proceeding by information filed in this court on August 12, 1936, by the General Chairman of the Bar Committees of Missouri, and the members of the advisory committee to the General Chairman. The information charges the respondent, a duly licensed and practicing lawyer in this State, with misconduct and seeks his disbarment. Upon the filing of the information the court appointed the Honorable John H. Taylor of the Livingston County Bar, commissioner, to hear the testimony and to report to the court his finding of facts and conclusions of law. There were twenty-four charges, upon eleven of which evidence was introduced. The commissioner found respondent guilty of ten of the eleven charges

and not guilty as to one of them and recommended a permanent revocation of the license of respondent to practice law. Exceptions were filed by respondent to the report and upon the submission of the case to this court an opinion was rendered findings respondent not guilty. Thereupon, informants applied to the Supreme Court for a writ of *certiorari*. Upon a hearing that court quashed the opinion of this court. [See State ex rel. v. Shain et al., 112 S. W. (2d) 882.] Thereafter, the case was set down in this court for further hearing and the cause has been submitted. On the first hearing, on the theory that this proceeding is founded upon section 11707, Revised Statutes 1929, and related sections of the statute, this court held that, in order to establish respondent's guilt, it was necessary for informants to show that he was guilty of professional misconduct or that he was guilty of a crime involving moral turpitude. This court found that neither of these was established. However, the Supreme Court held that the proceeding is not "based" on section 11707 and related sections but, is "based" upon Rules 35 and 36 of that court.

Rule 35 of the Supreme Court lays down a code of ethics governing members of the bar of this State. A mere examination of the rule and the statute shows that the rule is much broader in its scope than the statute.

The more serious charges preferred against respondent are not based upon his activities as an attorney at law but upon alleged misconduct in relation to the discharge of his duties as a county official.

The facts show that respondent, at the time of the hearing before the committee in 1936, was sixty-four years of age; that he was admitted to the Bar in 1914 at the age of forty-two; that prior to studying law he was a farmer; that he served three terms as probate judge and one term as sheriff of Macon county, where he resides; that he served as probate judge from January 1, 1915, to January 1, 1927; that from January 1, 1927, to January 1, 1933, he was engaged in the general practice of law in Macon county; that from January 1, 1933, to January 1, 1937, he served as sheriff of Macon county; that subsequent to January 1, 1937, he had been engaged in the practice of the law in that county.

In Charge No. I (a) respondent is accused of collecting two attorney's fees from the estate of J. W. Ratliff while he was probate judge and with approving a settlement showing the payment of these fees. In this connection it appears that he was employed as attorney in a partition suit, by some of the heirs, and was paid these fees on account of services rendered by him in the circuit court in that suit. The fees of the attorneys representing the heirs in the partition suit were, by agreement of the parties and the attorneys, allowed in the probate court and paid out of the personal property of the estate. When the case was before this court the first time attention was not called to the statute (section 2053, R. S. 1929) providing that a

probate judge may not act as attorney in a cause involving the partition of real estate. The statute does not make any exception and does not recognize the right of a probate judge to act as attorney in a partition suit or be paid a fee in such matters by an agreement of the parties. In addition to this, it is of doubtful propriety for a probate judge to allow himself a fee, even by agreement.

In Charge No. I (b) respondent is accused of borrowing $5000 from the estate of one Eliza Elder, a person of unsound mind, whose estate was pending in his court at the time the loan was made. There is no question but that respondent borrowed the money as charged. In fact, he does not contend in his brief that he did not borrow it. The overwhelming evidence, as well as a part of his own testimony, is that he did so. In other parts of his testimony he claimed that he borrowed the money from a trust company. However, it was shown that the trust company was acting merely as a straw person through whom the loan was made from the curator. Respondent testified to the effect that he borrowed the money through the trust company because he did not want it to appear that he was borrowing it from the estate.

The facts in connection with this loan show that the curator had $5250 deposited in a bank; that respondent told him that, under the law, he must loan it out and that it would be better to loan it in one sum; that respondent could use $5000 of it. The loan was made to respondent and afterwards, when the curator needed money apparently for the support of his ward, he borrowed $2000 from a bank, giving the note and deed of trust as collateral to secure the loan. Thereafter, the loan became in default and the deed of trust was foreclosed. The estate lost $2500 on the loan. A few months after the foreclosure respondent purchased the property from the purchaser at the foreclosure sale for $2100 and he and his wife now own it, free and clear of encumbrance. Subsequently the estate became exhausted and it was necessary that the ward go to a public institution, where she died.

Respondent testified that he was a well-to-do man at the time he borrowed the money; that his home, upon which he borrowed it was worth $8500; that, subsequently, he became insolvent and was unable to repay the loan; that he felt under no obligation to pay the heirs the balance due upon his note.

In Charge No. I (c) respondent is accused of borrowing $500 from the curator of Mary Richardson, a minor. There is no question but that respondent received the $500. He claims that he did not know that the money belonged to the estate; that he and the curator each put up $500 (respondent's part represented by the borrowed money) for the purpose of buying a farm, which they lost. The curator testified that he gave respondent a check for the $500 and that the check was signed by him as guardian. Respondent and his wife gave

the curator their note for the money. The inventory of the estate shows the note, dated February 7, 1927, as having been inventoried as a part of the estate. The note also appears in the final settlement of the curator. Thirty dollars and interest was paid by respondent on this note.

The curator testified that the note was not paid when he made his final settlement and he was required to account for it; that he finally settled the note on the 9th day of January, 1937, after bringing suit and that he lost $100 on the settlement. Respondent, as before stated, claimed that he did not know that the money was coming from the estate but thought it was a loan from the curator, personally; that he did not know that the interest was being credited to the estate; that he and the curator lost all of the money in the farm transaction; that he was willing to pay the curator $250, but the latter would not accept it. Respondent offered the note in evidence, which was dated after he left the office of probate judge.

The commissioner found respondent guilty on this charge. While this court, itself, must determine the matter by the weight and credibility of the evidence (In Re Richards, 63 S. W. (2d) 672, 677), the commissioner had a better opportunity to weigh the evidence than we. He saw the witnesses and observed their attitude and demeanor while testifying. In view of this and the fact that the note was inventoried as a part of the estate and mentioned in the settlement, which respondent approved, we accept the finding of the commissioner.

All reasonable persons would agree that this conduct of respondent in borrowing money from estates pending in his court was highly reprehensible, although he used no pressure on the curators who made the loans.

In Charge No. I (d) respondent is accused of collecting an inheritance tax in the estate of John Picton Williams, which estate was pending in his court, and diverting the same to his own use.

It is admitted that the sum of $397.10 was due the State for collateral inheritance tax in this matter; also, that this amount was paid to respondent by the administrator shortly after it was assessed in 1926, respondent agreeing to turn it over to the state treasurer, which he failed to do. The administrator testified that he did not know until 1929 that it was not paid to the state treasurer when a representative of the state treasurer's office called to see him about the matter.

The administrator testified that he took up the matter with the respondent who did not admit to the administrator that he had not sent the money but contended that it was sent and lost in the mails. Finally, the bank loaned respondent sufficient money to pay this tax. The facts show, however, that the money was not paid until the state treasurer had expressed an opinion that respondent should be prosecuted and that he "was going to have the attorney-general investi-

1182

gate this matter." Thereafter, respondent paid $535.79, which included penalties and interest.

In Charge No. I (d) (2) a similar accusation is made in reference to the estate of Thomas O. Evans. In June, 1926, this estate was assessed $54.55 as collateral inheritance tax and it was not paid until April 30, 1929, when it was paid by the administratrix of the estate.

Under the provisions of Section 580, Revised Statutes 1929, the executor or administrator of an estate is required to pay the tax assessed against the estate to the state treasurer, except two and one-half percent of such tax which he is required to pay to the probate judge for his fees. In this case the respondent suggested to the attorney for the estate that the money due respondent and the State be turned over to him and that he would pay over to the state treasurer the part due the State. The money was paid to respondent pursuant to this suggestion. At the time the state treasurer communicated with the administratrix about paying the tax the latter took the matter up with respondent. Respondent said that he did not have the money then but when he obtained it he would remit to her. In the meantime she was required to pay the state treasurer. She made numerous efforts to get respondent to pay the money. Thereafter,. and, before respondent paid her, the prosecuting attorney filed a charge of embezzlement against respondent. Thereafter, the latter came to the office of the attorney for the estate and paid the amount of the tax, penalty and interest. Respondent then tried to get the attorney for the estate to persuade the prosecuting attorney to drop the charge against him, which the attorney refused to do. The prosecuting witness requested the prosecuting attorney to dismiss the charge but he refused. The prosecuting attorney. proceeded with the case and a demurrer was directed at the close of the evidence, because the charge was that respondent had embezzled money from the estate and the check had been drawn by the administratrix on her personal funds. While respondent was on the stand he was asked about this matter and he referred to it as "just a little embezzlement case of $55.00."

In Charge No. I (d) (3) a similar accusation is made in reference to the estate of J. T. Browning. The files of the state treasurer's office in this estate show that a tax of $17.30 was assessed against the estate on May 11th, 1926; that the tax was not paid until May 15th, 1929, when it was paid by the respondent. This, as well as the other taxes, was paid only after an investigation by state officials.

Informants described this conduct of respondent with reference to these collateral inheritance tax matters as embezzlement.

While respondent's conduct in reference to these matters may not have amounted, technically, to embezzlement, insofar as it affects his character as a man of honesty and integrity, it is different only in degree. The record fairly discloses that the reason that respondent did not pay these sums of money sooner, was on account of his straitened

financial condition. However, as an honest man, he should have paid the money over to the state treasurer and not used it for any other purpose.

In Charge No. 1 (e) respondent is accused of failing and neglecting to pay over to Macon County monies due it from the collection of fees in the office of the probate judge and with pleading the Statute of Limitations when suit was instituted against him to recover the fees.

The legal proposition involved in the retention of these fees was a bona fide one affecting all probate judges in the State at the time, and depended on the construction to be given section 10695, Revised Statutes 1909. The state auditor had officially construed the law in accordance with respondent's position. A suit involving fees for the years 1915, 1916, 1917 and 1918 reached the Supreme Court. [Macon County v. Williams, 284 Mo. 447.] After the decision in that case was rendered, it being adverse to respondent, he paid over the amount of the judgment. He was later sued for excess fees retained by him, said fees having accrued during the pendency of the above-mentioned suit. Respondent defeated this suit by pleading the Statute of Limitations. If respondent was guilty of misconduct under this charge it was in the pleading of the Statute of Limitations.

The third charge covers acts alleged to have been committed by respondent while he was sheriff of Macon County. Under sub-division (i) of this charge respondent is alleged to have employed one Ed Bunton to do some painting for the county and inducing the said Bunton to charge in excess of his usual wage and to pay the difference to respondent.

The commissioner found for respondent on this charge and we have no disposition to differ with his finding.

In Charge 3 (l) respondent is accused of having exacted a reward from one Charles Wright for the recovery of stolen property, said reward being exacted after he recovered the property.

In reference to this charge, Wright testified that when he told respondent of the theft of the goods and, before the goods were found, the former stated that he was "willing to pay something to get it back." We think the weight of the evidence is to the effect that, while the amount of the reward was not fixed by Wright until after the goods were recovered by respondent and at a time when Wright did not know that they had been recovered, this charge involved little more than acceptance of a reward by a sheriff.

However, "the principle is well settled, on considerations of public policy, that an officer cannot lawfully receive, or recover, a reward for the performance of a service which it is his duty to discharge. This rule has been applied to jailers; policemen; sheriffs; deputy sheriffs." [23 R. C. L., pp. 1126, 1127.]

In Charge 3 (c) respondent is accused of corruptly and unlawfully attempting to influence juries in the James Hunt case.

The facts in this connection show that James Hunt was charged with first degree murder in the Circuit Court of Macon County that he was tried three times in the year 1936.

The evidence in the record is in reference to the conduct of respondent while in charge as sheriff of the juries sitting in the first and second trials of Hunt.

The evidence in this connection shows that respondent undertook to influence the jurors in the first and second trials. This fact was testified to by six jurors, who stated that during the trial of these cases, the jurors were in charge of respondent; that they stayed at his official residence at the jail building during the trials. One of these jurors testified that while they were at respondent's house he said that defendant (Hunt) was "guilty as hell" and another juror testified that respondent said of Hunt "the son-of-a-bitch is as guilty as hell." Some of them said respondent discussed the scene of the accident with them; one stated that respondent said that defendant ought to be convicted to support the officers. None of the jurors reported the matter to the court and none of them seemed to have been influenced by the conduct of the sheriff.

Respondent offered five witnesses who had sat on these two juries, all of whom testified that they did not hear respondent discuss the case, but the evidence shows that some of the jurors were upstairs and some downstairs and respondent's witnesses admitted that it was possible for respondent to have made the statements above without their hearing them.

However, one of the jurors, who testified against respondent, stated that respondent said to him, when the jury was going from respondent's residence to the courthouse, that the jury ought to convict Hunt to back the man who arrested him. Of course, the fact that some of the jurors testified that they did not hear this might be some evidence that respondent did not make this remark to the jury. Respondent offered no witnesses who contradicted the testimony of the six jurors who testified against him. One of these witnesses named six or seven jurors who were present at the time of these discussions. Respondent did not offer any of these six or seven jurors as witnesses.

One of the jurors who gave testimony unfavorable to respondent at the hearing before the committee, testified that respondent came to him afterwards, and before the hearing before the commissioner, and "said something to him in regard to his testimony here before and said 'You can kinda go around a little with that, can't you' and I told him 'no.' " Another juror testified that respondent "had talked to him the other day and told him that he was mistaken in his testimony; that it didn't take place where it said it did; that respondent said that his discussion was after the jury had reached a verdict and was discharged."

When respondent was asked about his conversation with the jurors

during the trials of Hunt he answered: "If I ever made any discreet remark like that I have no recollection of it." Again, he stated: "I don't think it was ever mentioned in any way at all." Later on, he finally stated: "It is not true."

Respondent did not take the stand to deny that he had attempted to influence the juror, who testified in the present case, to change his testimony.

The commissioner saw the witnesses and heard their testimony and we are not disposed to differ with him in his conclusion in reference to the guilt of respondent in this matter. Respondent's conduct in this connection was most reprehensible.

The fourth charge is that respondent has unlawfully practiced law in the courts of Macon County while Sheriff of that County.

The prosecuting attorney of Chariton County testified that about two years prior to the trial of this case one McGilvray, an elevator operator at Mendon, Missouri, was given a bad check (approximately $80.00) by one Burch living in Macon; that a complaint was made before a Justice of the Peace, and a warrant sued out and sent to the Sheriff of Macon County; that a few days after that the constable received a letter from respondent. This letter was introduced in evidence. It is headed:

"B. R. Williams
Sheriff of Macon County
Attorney at Law and Ex-Probate Judge
Macon, Missouri."

In it respondent stated that he was holding the warrant after arresting Burch; that he had collected $60.00. The letter further stated: "I think I will be able to get the balance of this this coming week. I thought this was the best way to handle it knowing the situation as I do that if we arrested him and put him in jail, we wouldn't get anything and he would probably lose his truck and lose a good job or a good contract that he is now working on. I might not be able to get the balance of it this coming week but you can tell Mr. McGilvray that I, personally, will stand good for the balance of it and get it just as soon as I can.

"I have tried the harsh way a few times myself and I never got anything so for you and Mr. McGilvray this is the best way. I may be the goat but I am like the girl who said, 'I'll try anything once' and I am sure I'll get it worked out o. k."

Other letters were introduced in evidence written by respondent to McGilvray, in one of which respondent stated that he had seen Burch "last night and he thought he would be able to pay the balance of this sometime this coming week. I still have the warrant against him and he thinks I'll put him in jail if he doesn't do it."

In another letter he stated: "I have the warrant here yet and can pick him up at any time if you say so." In another: "I gave him

a few hours to raise the balance of the money due on the account and in my absence this afternoon he came in, after a lot of grumbling and fussing around this morning, and paid it but I am still holding the bag. I have taken out this ten per cent commission and which is for handling it and the extra work I have had to do on it. That makes $9.87, and that from $36.87 leaves a balance due you of $27.00. I am enclosing my check for that amount.''

Respondent testified that he loaned Burch some of the money with which to pay McGilvray, part of which money so loaned, he had never been able to collect.

It is claimed by respondent that he did not arrest Burch because McGilvray did not want him arrested if the latter could get his money and that it was a very common thing for people to file charges against a debtor for the purpose of using the sheriff's office to collect what is due them.

In this case the evidence fails to show that there was any suggestion by anybody that the warrant not be executed until respondent wrote his first letter, in which he, himself, suggested that ''I thought this was the best way to handle it knowing the situation as I do that if we arrested him and put him in jail, we wouldn't get anything.''

While the record discloses that McGilvray was primarily interested in getting his money and was willing to let the matter drop when he got it, it appears that the whole idea of not arresting Burch was that of the respondent and his letters show that he was holding the warrant over Burch for the purpose of making the collection and when he finally made it, he deducted 10 per cent for his services. Regardless as to who first suggested that the warrant be used to collect the debt, respondent was clearly guilty of the wrongful use or abuse of process in this instance (50 C. J., p. 615) and, in addition to this, the evidence is subject to the inference that he pursued this course for the purpose of obtaining a commission in the transaction. In cases where the misconduct was perhaps more flagrant than in the case at bar states attorneys were suspended from practice. [In re McCowan (Calif.), 170 Pac. 1100; In re Waggoner (So. Dak.), 206 N. W. 427.] Respondent has cited no authority justifying his retention of a commission in this instance and there is a strong inference from the testimony that this is not the only case where he pursued the same course and retained similar commissions.

Respondent, in all of his correspondence, whether relating to his office as sheriff or the practice of the law, used the letter-head set forth above.

Respondent, at one time, while serving as sheriff, wrote a letter using this letter-head threatening suit for the collection of a note. He denied that he intended to convey, by means of the language used, any threat to sue. He did not file the suit. There is no evidence that he ever filed a suit of any kind in Macon County while he was serv-

ing as sheriff. If he practiced law in any court it was in jurisdictions outside of Macon County. There is no statute prohibiting a sheriff, who is a lawyer, from practicing law. It would be improper for a lawyer, who is also sheriff of a county, to try cases before juries that he, or his deputies, summoned or had charge of; also in cases where his office had anything to do with the subpoenaing witnesses or serving process, or, for that matter, where he performed any other official duty. Probably it is also true, that if one engaged in the practice of law in courts where he, as sheriff, is required by law to officiate, such conduct would disqualify him to act as sheriff. Our statute provides that the coroner shall act in lieu of the sheriff where the latter is an interested party or disqualified. [Section 11524, R. S. 1929.]

As before stated, there is no evidence that respondent ever had any case in the Circuit Court of Macon County while he was serving as sheriff. He stated he used the letter-head as an advertisement; that it had cost him a lot of money to get what little law education he had. He further testified that he had never read the rules of the Supreme Court. There is no question but that it was unethical for respondent to have used the letter-head in question.

Respondent offered as a witness, the judge of the Macon County Circuit Court, in reference to the former's conduct as sheriff. The judge testified that he knew nothing of respondent expressing his personal opinion before juries; that no juror had ever come to him and reported any interference from outside parties; that it had never come to his attention that the sheriff's office had approached a juror or had done anything with reference to the deliberation of the jurors or juries; that respondent had made a good sheriff. He was not asked as to respondent's general reputation but respondent offered seven character witnesses, who testified that his reputation for honesty and truthfullness was good. Each of them testified, however, that his reputation was much discussed in the county and many people thought it was bad. However, most of these witnesses testified that these statements derogatory of respondent were made during political campaigns in which respondent was a candidate for office.

In contending that the facts in this case show that respondent should be disbarred, informants call our attention to clause 47 of Rule 35 of the Supreme Court, which reads as follows:

"A lawyer should always maintain his integrity; and shall not willfully commit any act against the interest of the public; nor shall he violate his duty to the Courts or his clients; nor shall he, by any misconduct, commit any offense against the laws of Missouri or the United States of America, which amounts to a crime involving acts done by him contrary to justice, honesty, modesty or good morals; nor shall he be guilty of any other misconduct whereby, for the protection of the public and those charged with the administration of justice, he should no longer be entrusted with the duties and responsibilities belonging to the office of an attorney."

The most serious charges against respondent consist of alleged acts of misconduct committed by him, not while acting in his professional capacity but while he was probate judge and sheriff. However, a well recognized ground for disciplining an attorney is for misconduct amounting to moral delinquency whether such delinquency is in reference to professional or *non-professional* conduct. [5 American Jurisprudence, pp. 426, 427; In Re H————S————, 69 S. W. (2d) 325, 327; In Re Wilson, 79 Kansas, 450; The State of Conn. v. Peck, 88 Conn. 447, 450, 451; Anno-Attorney-Disbarment, 43 A. L. R. 108.] "As proof of a good moral character is an undispensable requisite for admission to the Bar, the continued possession thereof is equally essential, and an attorney may be disbarred for misconduct, professional or nonprofessional, which shows that he has forfeited his claim thereto. But, in order to warrant the revocation of an attorney's license for want of a good moral character, his moral delinquencies must be such as to unfit him for the proper discharge of the trust reposed in him; thus, it must appear that he is lacking in common honesty, or veracity." [2 Thornton on Attorneys at Law, pp. 1261, 1262.]

It has been held "that the courts may suspend or disbar an attorney for misconduct relating to his duties as a justice of the peace, magistrate, sheriff, district or prosecuting attorney, village attorney, attorney-general, or as a fiduciary under a court appointment." [7 C. J. S., p. 757.] "The court may disbar an attorney betraying a lack of moral qualifications although acting as a judge, notwithstanding the misconduct bore no relation to his duties and responsibilities in his professional capacity." [7 C. J. S., p. 764.] This statement is equally as applicable to a sheriff, or any other official, who is an attorney.

Lawyers may be disciplined for offenses involving moral turpitude. [7 C. J. S., p. 733; 5 American Jurisprudence, p. 417; In Re Disbarment of Wallace, 323 Mo. 203.] Moral turpitude is an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellowman, or to society in general, contrary to the accepted and customary rule of right and duty. It is an act done contrary to justice, honesty, modesty and good morals. [In re Disbarment of Wallace, *supra.*]

"*Any conduct* on the part of an attorney evidencing his unfitness for the confidence and trust which attend the relation of attorney and client and the practice of law before the courts, or showing such a lack of personal honesty or of good moral character as to render him unworthy of public confidence, constitutes a ground for his disbarment." [7 C. J. S., pp. 733, 734.] (Italics ours.) "To warrant the removal, however, the attorney's character must be bad in such respects as to show that he is unsafe and unfit to be trusted with the powers of an attorney, as conduct which is merely discreditable to the attorney, but not dishonorable or criminal conduct, may not be ground for suspension or disbarment." [7 C. J. S., p. 735.]

In order for an attorney to be disbarred it is not necessary that the offense with which he is charged be indictable (5 American Jurisprudence, p. 427) and, if indictable, and the attorney has been prosecuted and found not guilty he, nevertheless, may be proceeded against. [In Re Richards, 63 S. W. (2d) 672.] An attorney may be disciplined for the violation of a code of ethics, such as contained in the various provisions of Rule 35 of the Supreme Court, even though the acts constituting such violations may not amount to moral turpitude. [7 C. J. S., pp. 742, 743.]

It is difficult to state, generally, what acts, constituting moral delinquency, will render an attorney subject to disciplinary action but, "indulgence of vices affecting to some extent the moral character, but not personal or professional integrity, has usually been held not a sufficient ground for disbarment." [5 American Jurisprudence, p. 427.] It is only for that moral delinquency which consists in a want of integrity and trustworthiness, and renders him an unsafe person to manage the legal business of others, that the courts can interfere and summon him before them. [2 Thornton on Attorneys at Law, p. 1264.]

The power to disbar or suspend "is not an arbitrary and despotic one to be exercised at the pleasure of the court or because of passion, prejudice, or personal hostility, it is rather one to be used with moderation and caution, in the exercise of a sound judicial discretion, and only in a clear case, for the most weighty reasons, and upon clear legal proof." [7 C. J. S., pp. 729, 730.]

"The nearest approach to a precise definition which will cover the entire subject may be stated thus; an attorney is guilty of misconduct whenever he so acts as to be unworthy of the trust and confidence involved in his official oath, and is found to be wanting in that honesty and integrity which must characterize members of the bar in the performance of their professional duties. The misconduct, however, must be wilful, but it need not be corrupt, or of a criminal nature." [2 Thornton on Attorneys at Law, p. 1187.]

In re H———S———, 69 S. W. (2d) 325, 327, it is said: "In other words, 'any conduct on the part of an attorney evidencing his unfitness for the confidence and trust which attend the relation of attorney and client and the practice of law before the courts, or showing such a lack of personal honesty or of good moral character as to render him unworthy of public confidence, constitutes a ground for his disbarment."

Some of the charges "the truth of which has been established" are very serious in their nature and others less so. Some of them warrant suspension or disbarment. Others are no more serious than to justify a reprimand and possibly some of them should not be held to subject respondent to any disciplinary action by the courts. However, taking those which justfy disciplinary action, as a whole, we think they

show that respondent is lacking in that degree of honesty and probity that should be manifested by all attorneys. The most serious charges against respondent are his borrowing of money from estates in his court when he was probate judge; his settlement of the Burch matter; his tampering with the juries in the Hunt trials while he was sheriff and his retention of collateral inheritance taxes paid over to him to to be sent to the state treasurer. All of these charges show that he manifested traits and characteristics showing a lack of integrity and honesty which a lawyer should possess in order to transact faithfully and honestly, the duties of attorney-at-law. Perhaps the worst offense he has committed was his attempt to influence the juries in the Hunt cases. Thornton comments upon the conduct of an *attorney* who attempts interference with jurors and states: (2 Thornton on Attorneys at Law, p. 1243) : "The law is watchfully jealous of the purity and independence of juries, which are regarded as essential in the administration of justice and the protection of individual freedom, and any undue interference therewith, no matter by whom, will be rebuked, and, possibly, an offender in this respect may also be punishable for violation of the penal laws. Wrongs of this character are especially aggravating when they are committed by counsel who are sworn officers of the court, and whose duty it is to act as guardian of the fountains of justice, and who are false in their charge, when they defile or taint those waters, which they are pledged to keep pure and unpolluted." The action and conduct of a sheriff in attempting to influence jurors should be characterized equally as strong.

In a murder case the statute requires that the jurors be kept together. [Section 3882, R. S. 1929.] The jury is placed in the hands of the sheriff whose duty it is to see that no outside influence is brought to bear upon them. He hears the judge of the court caution the jurors in ordinary criminal cases not to talk to persons about the case. [Section 3682, R. S. 1929.] In a felony case, before the jury retires to deliberate upon their verdict the sheriff is required to take an oath to keep them together and not to speak to or communicate with them. [Section 3683, R. S. 1929.] The life and liberty of a defendant depends, in a measure, upon the faithful performance by the sheriff of his duties. A man charged with a crime will be deprived of the reputation given him by the laws of the State if a sheriff undertakes to interfere with the deliberation of the jury.

We think that the conduct of the respondent, in his official capacity while holding office as judge and sheriff, in reference to the matters we have alluded to, is to be condemned in no uncertain terms. It is unusual, in cases of this kind, to find so many charges against an attorney of which he is guilty, the whole proceedings being climaxed by the accused attempting to have a witness at the hearing to change his testimony. While, as before stated, some of the charges may not be of serious import yet, taken as a whole those which justify discipli-

nary action, show a lack of the proper regard, not only for ethics and the properties but a proper conception of the duties of a public official and a good citizen.

However, respondent points out that some of the charges against him go back as much as fifteen years and that "old and stale complaints against attorneys should be looked upon with disfavor."

"Staleness in a charge against an attorney may prevent its being considered, because an unreasonable delay in the presentation of the charge of misconduct may make it impossible for an attorney to procure witnesses or the testimony which would have been available at an earlier time to meet such charge. However, the court will not refuse to hear charges of unprofessional conduct against an attorney because of expiration of long period of time unless it would be unjust to compel him to answer such charges." [7 C. J. S., p. 766.]

"It is and should be the policy of the law to forgive one his errors long since past, and not to allow the same to be resurrected, where there is nothing to show but that for several years after such wrongdoing the party may have lived an exemplary life." [Re. A. Sherin (S. D.), 40 L. R. A. (N. S.), pp. 801, 805. See, also, In Re Elliott, 73 Kansas 151.]

There is no ground for the application of the doctrine of laches in this case and respondent's misconduct has continued down to a comparatively recent date.

We find respondent guilty on charges I(b); I(c); I(d) (1); I(d) (2); I(d) (3); 3(1); 3(o) and the fourth charge relative to the settlement of the Burch matter. We do not pass upon other charges, as the ones just mentioned are sufficient to justify and support the disciplinary action we are about to take.

What should be the punishment imposed? In this connection, it is well stated in American Jurisprudence (see 5 American Jurisprudence, pp. 413, 414): "The power to disbar is not an arbitrary and despotic one, to be exercised at the pleasure of the court or from passion, prejudice, or personal hostility; it is the duty of the court to exercise and regulate it by a sound and just judicial discretion, whereby the rights and independence of the bar may be as scrupulously guarded and maintained by the court as the rights and dignity of the court itself. It should disbar or suspend an attorney only where the continuance of the attorney in practice would be subversive to the proper administration of justice or incompatible with a proper respect of the court for itself or a proper regard for the integrity of the profession. The court should also exercise a sound discrection in determining whether the attorney should be disbarred or merely suspended for a period. The consequences of disbarment are so severe, both in degrading him in the eyes of the community and in depriving him of his means of livelihood that courts generally take that step only when the misconduct of the attorney may properly

be characterized as gross, and in cases of lighter offenses or of first delinquency, the minor punishment of suspension is usually inflicted.''

''Disbarment will be decreed only when the court is convinced of its necessity for the protection of the profession, the courts and the public, and a removal from the bar should not be decreed where any punishment less severe, such as reprimand, temporary suspension, or fine, would accomplish the end desired'' (7 C. J. S., pp. 806, 807), ''the purpose of which (disbarment) is not so much to punish as to ascertain those whose conduct has demonstrated their unfitness to practice law, and to deprive them, either temporarily or permanently, of their previously acquired privilege to serve as officers of the court.'' [In Re H—— S——, *supra*, l. c. 327.]

''It is a generally accepted principle, however, that since the primary purpose of a disbarment proceeding is not punishment, but the protection of the courts and the public, disbarment should never be decreed if any discipline less severe would accomplish the desired result, as when there are prospects that the attorney's conduct and character may undergo reformation.'' [2 Thornton on Attorneys at Law, p. 1316.]

Respondent is a man past middle age. He has been elected various times to offices of honor and trust in his county. Evidently, at the time of the taking of the testimony in this case he was a man of considerable standing in his community. He was elected sheriff even after some of the matters that have been charged against him must have become public and must be a man of redeeming qualities.

We think it not too much to hope that he will be brought to a realization of the impropriety of his conduct after this court has pointed out, as we have done, in no uncertain terms, the seriousness of his transgressions, and has passed judgment upon him carrying with it a measure of severe punishment. A lawyer should not be permanently deprived of his profession when he has reached an age where it would be difficult for him to enter any other walk of life, if there is reasonable hope of reformation.

We, therefore, are of the opinion, that instead of being disbarred, the respondent should be suspended from the practice of law for a period of two years, with the privilege, however, of moving before this court for reinstatement after the expiration of such time, upon satisfactory proof that he had paid to the parties entitled thereto the balance unpaid on the loans he obtained from the Elder and Richardson estates, or so much thereof as he shall be financially able to pay, and that he has led a life of honor and probity and has reformed in character. [See In Re Evans, 94 No. Car. 414, 424.]

*Kemp, J.*, concurs; *Shain, P. J.*, not sitting.