**In the Matter of Philip A. FOLEY,
Petitioner.**

No. 49249.

Supreme Court of Missouri,
En Banc.

Jan. 14, 1963.

George E. Murray, Clayton, William J. Hough, St. Louis, for petitioner.

Arthur H. Slonim, Clayton, for the Advisory Committee.

DALTON, Judge.

This is an original proceeding for disciplinary action, which was instituted in this Court when Philip A. Foley, a duly licensed attorney, filed his verified petition alleging that he had been indicted and convicted in the United States District Court, Eastern District of Missouri, Eastern Division, on two counts for *willfully and knowingly* attempting to evade and defeat income tax due and owing by him and his wife for the years 1952 (Count I) and 1953 (Count II) *by the filing of false and fraudulent joint income tax returns.* He has voluntarily submitted himself for disciplinary action.

 This Court has original jurisdiction of matters pertaining to the disciplining of members of the Bar in this State, and it may suspend or disbar an attorney in a proper case. In re Richards, 333 Mo. 907, 63 S.W.2d 672, 673(1).

1

Foley's petition further alleged that he had pleaded "not guilty" to the charges made against him, but that, after a jury trial of nine days, he was found guilty on both counts and, on July 8, 1960, had been sentenced to concurring terms of imprisonment for three years and had been fined $2500 on each count; that he had appealed to the United States Court of Appeals (8th Circuit); that said Court had affirmed the judgment of the lower court (Foley v. United States, 290 F.2d 562); that he had, thereafter, filed his petition for a writ of certiorari in the Supreme Court of the United States which was denied, 368 U.S. 888, 82 S.Ct. 139, 72 L.Ed. 88; that he had then filed motions for reduction of sentence or parole which were denied; that he had been ordered to report so that sentence could be carried out in conformity to the judgment of the court; that he was willing and anxious to appear voluntarily before this Court to make full and complete disclosure of all the facts and circumstances touching upon his qualifications as a lawyer and give satisfactory assurance that he would "never again be guilty of conduct in any manner reflecting upon his profession." Thereafter, by order of this Court, his petition was referred to our Advisory Committee (see Supreme Court Rule 5, particularly subdivisions 5.14, 5.17, 5.18 and 5.19, V.A. M.R.) for such action or recommendations as it might deem proper.

The Advisory Committee held a hearing with reference to said matter, at which hearing petitioner appeared, with counsel, and testimony was heard to the extent of some 365 pages of transcript, excluding exhibits filed and considered. On June 1, 1962, the Committee filed its report recommending that petitioner be granted leave to appear before this Court for disciplinary action and stating that after a careful consideration of the entire record the Committee was unanimously of the opinion that petitioner should no longer be entrusted with the duties and responsibilities belonging to an attorney; that by failing to maintain his moral character and honesty he had

rendered himself an unfit person to further engage in the practice of law; that he should be disbarred and his name stricken from the roll of attorneys in this State, or that if the Court deemed a suspension rather than disbarment adequate to protect the public interest the suspension should be of indefinite duration, with leave granted petitioner to apply for reinstatement after the expiration of a substantial period and upon a showing that petitioner was then of good moral character and fully qualified to be licensed as a member of the Bar of Missouri.

Thereafter, on September 28, 1962, the cause was heard in this Court and submitted upon petitioner's petition and the record made before the Advisory Committee and the Committee's report in said cause.

Before reviewing the evidence in this record perhaps we should say that, regardless of the verdict and judgment of conviction above mentioned, and regardless of the affirmance of said judgment by the United States Circuit Court of Appeals, petitioner took the position before the Advisory Committee, and further takes the position here, that he was at no time guilty of *willfully and knowingly filing false and fraudulent joint income tax returns* as charged in said indictment and as found by the jury.

Philip A. Foley was born in 1903 in St. Louis, Missouri, and at the date of the hearing before the Advisory Committee resided in Creve Coeur, St. Louis County, Missouri. He attended St. Mary's College and St. Louis University, studying law at St. Louis University, but he did not graduate therefrom. He took his Bar examination and was admitted to practice in Missouri on November 19, 1926. He commenced practice in Clayton, Missouri, in 1926 and has continued to practice in St. Louis County. He served as City Attorney of Richmond Heights, Missouri, for twenty years, and was City Attorney of Olivette, Missouri, for two or three years. He also served as City Attorney of Fenton, Missouri. At one time he served as an Assistant Attorney General of Missouri under

Attorney General Roy McKittrick. At all times he maintained law offices in Clayton, Missouri. He engaged in the general practice of law, but the greater portion of his practice has been in the handling of criminal cases, divorce cases, and an occasional damage suit. Much of his practice was trial work in the Justice of Peace Courts or later in the Magistrate Courts. He was married on February 23, 1926, and he and his wife have a son and daughter and five grandchildren.

Mr. Foley assisted in organizing the St. Louis County Bar, and he thereafter served as Vice-President and then as its President. He served as Legal Adviser of the Draft Board during World War II.

The indictment returned against petitioner on February 5, 1959, in the United States District Court, Eastern District of Missouri, Eastern Division, alleged that the petitioner's 1952 return showed a net income of $4,053.27 and a tax due thereon of $500.22, whereas the net income from that year was $8,684.78, upon which there was owing a tax of $1,597.66; that the return filed for 1953 showed a net income of $4,-231.34 and a tax due thereon of $672.96, whereas the net income for that year was $11,805.60, with a tax owing thereon of $2,627.62. At the trial the government showed a net income in 1952 of $8,036.04, with a tax due of $1,438.06, and for 1953 a net income of $9,700.89, with a tax of $2,017.26. The government further proved that petitioner had gross receipts of $19,-890.78 in 1952 while his return showed only $11,351.00, and a gross income of $20,450.-48 in 1953, while his return for that year showed a gross income of $9,526. In other words, by some 130 witnesses the government established large amounts of fees and rentals and other income so that his returns were for roughly half of what his actual gross income was.

Since petitioner still takes the position, and so testified before the Advisory Committee, that he did at no time "wilfully and deliberately falsify or fraudulently prepare

or cause to be prepared and filed any fraudulent returns for 1952 and 1953 or for any other years", we shall adopt and include in this opinion the statement of facts in the opinion adopted by the United States Court of Appeals for the 8th District. Substantially the same facts appear in the record before the Advisory Committee, including the opinion itself and the record upon which it was based. The statement is as follows:

"Concededly, the defendant failed to keep adequate records for the purpose of recording his income and deductible expenses; rather, he relied upon his memory and bank book which disclosed his deposits. Apparently he would total the deposits for the year, deduct therefrom items which were not taxable, such as amounts due clients included in the deposits and then he would add an arbitrary amount which ran between $1,500 and $2,100 estimated by him to represent cash receipts. In order to reconstruct the true income, the Government brought into court numerous former clients of the defendant who testified as to the amounts paid by them. Of the total of 130 witnesses who testified in behalf of the Government, 113 were former clients and others called to establish legal fees paid to defendant during the two years in question. There were, in addition, stipulations received in evidence of 58 other clients who had paid defendant legal fees during the period under consideration. It was also stipulated that 7 attorneys who had officed in the same suite with defendant, paid defendant $2,254.-63 in 1952 and $2,637.69 in 1953, as their share of rent, secretarial assistance and office expense. None of the amounts so received by defendant was reported as gross income, but it appears that defendant deducted as a business expense only his share of these expenses, the amount not covered by payments from other attorneys.

"The trial of the case was somewhat unusual, in that with the exception of one Roy Graham, there was no effort made by defendant to discredit any of the witnesses or their testimony. Thus, the issue which was litigated and resolved by the jury was

whether the misstatement of income was the result of unintentional error or mistake on the part of one wholly unfamiliar with the exacting requirements of the revenue laws, as contended by defendant, or whether the defendant filed false and fraudulent returns for the purpose of evading taxes, which was the Government's position throughout the trial.

"Graham, the controversial witness, was a professional bondsman and he also operated a tavern known as 'Graham's Grill.' Until about August, 1953, Graham and defendant were close friends. During the year 1952 Graham gave defendant five checks totaling $2,837.35, and in 1953 five checks totaling $3,154.38. Graham testified that defendant had represented him and taken care of his legal matters since 1933, without compensation; that in 1952 Graham found himself in a financial position where he was able to pay defendant for past services, and although not requested by defendant to do so, Graham paid defendant the amounts represented by the checks above mentioned. Graham emphatically denied that he had a partnership arrangement with defendant whereby the latter was to receive one-half of the net income derived by Graham from signing appearance bonds. On the other hand, defendant's version was that he had been instrumental in procuring bond business for Graham, in that he had, in early 1952, prevailed on the Sheriff of St. Louis County, Missouri, to permit Graham to sign appearance bonds; that in consideration for this service Graham had agreed to split all net bond income with the defendant, that is, all expenses were to be first deducted, and, as an additional consideration, Graham agreed to pay defendant's share of the tax on the income received by the latter. Defendant testified that one of the 1953 checks, in the amount of $1,000 was endorsed and returned to Graham in consideration for a $937.50 check of Foley's, payable to Foley's secretary, which had been cashed for her by Graham. Both she and defendant testified that this represented back salary due her.

"Not only did defendant fail to report the income so received from Graham, but concededly he did not deposit any of the checks in his bank account. Defendant testified that Graham gave him small amounts of cash from time to time, and each time defendant received a check, he would endorse it and Graham would give him the cash difference above those sums previously advanced. Graham made a record of the checks so furnished and endorsed them 'Graham's Grill,' after which they were deposited in Graham's bank account. Graham did not produce any of his records at the trial, claiming that they had been destroyed after the records had been fully and completely investigated and checked by the Internal Revenue Service and after Graham had paid additional taxes on his income."

Petitioner's testimony before the Advisory Committee tended to show that he had never taken any tax courses or attended any seminars or lectures on tax law nor with regard to taxation; that he "knew nothing about income taxes or the process of it"; that Shad Bennett had made his income tax returns prior to 1952, after petitioner had provided him with the information; that he and Bennett had been together for twenty-five years; that his 1952 return was prepared by his half brother, Anthony Foley, who worked at the Department of Revenue in St. Louis; that he had furnished him with the records he had, to wit: bank deposits and statement of the expenses and other things to be transcribed into his income tax return; that he had never filled out any forms with reference to income tax; that no one had said anything to him about it in the past, nor had he ever estimated his tax; that he had never prepared a tax return of his own; that the 1953 return was prepared by John Molloy "because I could never figure out what the tax, [sic] never attempted to figure it out, never made a return in my life of my own"; that his clients were poor and that he received small fees and his practice had been of the same general pattern for thirty-three years; that on two occasions he had been sued for

office rent; that the only records that he did have in his office were his files and his diaries as to court appearances; that he kept no records of receipts in his office; that money he would get in the courtroom or out on the street or some place like that from people, he would take that and sometimes make a notation on a piece of paper and set it down and at the end of the year sometime gather up some of those papers and some would be accurate and some wouldn't be accurate and he tried to over-estimate the income and thought he was doing it; that he lost thousands of dollars in fees by virtue of the fact that he did not keep any kind of an account book of fees due him. As to why he didn't keep some record of the money that he was receiving, he gave only one explanation: "I got busy and my practice picked up and I was running back and forth to the Court I just failed to do it, just pure neglect, I presume, from going into a situation. That is all I could explain to you." He said he did not understand that the government would not permit him to estimate and guess at his income; that in making his returns he was only guessing at the cash, since the big items went into the bank and that the only checks he would cash "would be checks when one would come in and I would cash that for ready cash." A great many of such checks were for small fees of three, five and ten dollars; that the fees he put in his pocket or the checks that he cashed he made no record of, only those that he deposited in the bank; that at the end of the year he would make his estimate of "what I had cashed in and got in cash and checks I had cashed"; that neither his half brother nor Mr. Bennett or anyone else, who had made his returns, had called his attention to the fact that he was supposed to keep a record of his income and expenses. While he admitted renting office space to lawyers, he kept no record of rents as to whether or not they were paid, and relied on the tenants as to what they owed him. He said: "We were all living from hand to mouth and they couldn't pay and, therefore, if they couldn't pay me I couldn't carry the whole load." The rent was not treated as income and he deducted the whole year's rent on the premises from his deposits whether it had been paid or not: "I took that off each year and sort of carried it on that way"; that the office spaces he was subleasing totaled around $2,300 per year and he deducted that from his deposits because he figured "well, that wasn't income." When questioned about it, he answered: "Well, all I can say is what I told you, how I was treating it I don't know, that's the way I did it." He described his indictment by saying: "I think the whole thing was political", and he also said that his indictment was due to the fact that he didn't know a single, solitary thing about income taxes in the first place. He still claimed he was completely ignorant in that area, although admitting that he was reputed to be one of the best trial lawyers in St. Louis County. He said that the only excuse for his trouble was that he didn't realize he had to keep any books or records with reference to receipts from clients. A further excuse was that he believed it was legally possible for him to receive some $5,000 in money from Roy Graham in such a way that it would not be taxable income, even though it was the earnings and profits from a bond business. When asked about his ignorance of tax laws, he insisted: "I never, never done any tax matters." As to his 1953 tax return, he said: "All I know, as far as those figures are concerned, what, Molloy figured this out, I know nothing about it, about them. I couldn't figure what he has done there to save me, follow back and forth. I relied upon him to make this amended return, relied upon his ingenuity as an accountant." As to the Graham money, he testified that from time to time he did meet Graham on the street or in the court house and would say, "Roy, have you got any money," and he would hand him five, ten, fifteen, or twenty dollars and that couldn't have started until March of 1952, while the first check from Graham in the amount of $195.68 was dated May 19, 1952. As to the Bennett matter, he said the

$2,500 was a loan from Shad Bennett made on two different occasions, one for $1,500 and the other for $1,000; that Bennett did *not owe any back rent that he knew of;* and that his debt to Bennett was evidenced by a note with six per cent interest. He admitted that he had never paid the notes or any interest on them. He said Bennett had never made any demand upon him and that he had expected Bennett to continue to pay his rent monthly regardless of the loan. Bennett had testified in the trial of the criminal case that the $1,000 was a loan and the $1,500 was for rent due petitioner.

Petitioner also told the Advisory Committee that he didn't consider the Graham payments to him as income; that he had never done any legal work for Graham and thought he needed to make no record of Graham's payments, and accordingly he had treated the Graham payments as "a windfall" rather than income. Petitioner said: "I thought he was going to make his return, pay the taxes on it and the taxes on the money he gave me would have been paid, that's what I thought he meant. * * * That was my complete understanding and that's his exact words." As to his failure to keep a record of legal fees he further said: "I think I was very, very stupid in that respect."

Most of the transcript before us consisted of the testimony of witnesses as to the petitioner's good character and reputation. Twenty-five witnesses (including fifteen lawyers, three circuit judges, a prominent pastor and six outstanding business and professional men) appeared and testified as to the excellent reputation and character of petitioner. Substantially all of these witnesses testified that prior to petitioner's conviction he bore an excellent reputation as a lawyer and as a man, and numerous ones testified that he still bore such a reputation, especially among his friends and acquaintances. His word was his bond and they had found him honest and dependable. It was apparent from the cross-examination of these witnesses that many of them assumed that petitioner's acts with reference to the filing of said income tax returns *was not intentional* and, therefore, they did not consider that the conviction affected his reputation and their regard for him. In other words, they felt that in income tax matters a jury might find either way and the verdict of the jury was not in any-wise binding upon them. They refused to accept the verdict of the jury *on the issue of willfully and knowingly filing fraudulent returns.* A few had had difficulty with representatives of the government in dealing with income tax matters and, therefore, indicated that they were not convinced of any wrongdoing on the part of petitioner regardless of the jury's verdict. To many the prosecution only evidenced a dispute as to income taxes due. Some testified that as lawyers they were not convinced that petitioner had committed an intentional violation of the income tax law even though petitioner was convicted. A few of them agreed that the conviction had affected petitioner's reputation adversely. Others said that the conviction had had no effect upon their esteem for petitioner personally, and some of them indicated that they placed income tax convictions in a totally different class from convictions for other crimes. Because of lack of time and other considerations the Advisory Committee permitted petitioner to file letters and affidavits of some fourteen additional witnesses (two circuit judges, eleven lawyers and one businessman) as to petitioner's good character and his excellent reputation in the community in which he had lived and practiced law.

Petitioner first contends that the conviction in the United States District Court of an offense under 26 U.S.C.A. § 145(b) is not under the facts and circumstances of the instant case a conviction for an offense involving moral turpitude within the meaning of Secs. 484.240 and 484.-190 RSMo 1959 or Supreme Court Rule 4.47. We find no merit in this contention.

Sec. 484.240 RSMo 1959, in part, provides with reference to charges against an

attorney that: "If the charge allege a conviction for any criminal offense involving moral turpitude, the court shall, on production of the record of such conviction, remove the attorney so convicted or suspend such attorney from practice for a limited time, according to the nature of the offense, as the court may deem just, and without further trial." Sec. 484.190 also provides for the removal or suspension of an attorney "[i]f he be convicted of any criminal offense involving moral turpitude." Supreme Court Rule 4.47, governing conduct of lawyers, in part, provides that: "A lawyer should always maintain his integrity; and shall not willfully commit any act against the interest of the public * * nor shall he, by any misconduct, commit any offense against the laws of Missouri or the United States of America, which amounts to a crime involving acts done by him contrary to justice, honesty, modesty or good morals; nor shall he be guilty of any other misconduct whereby, for the protection of the public and those charged with the administration of justice, he should no longer be entrusted with the duties and responsibilities belonging to the office of an attorney." Petitioner argues that the offense of which he was convicted is not a "criminal offense involving moral turpitude" and insists that he has committed no act "contrary to justice, honesty, modesty or good morals." Petitioner also contends that an attempt to evade a tax due the Nation, wrong as it is, is not an act evidencing baseness, vileness or depravity of moral character. Petitioner cites United States v. Carrollo, D.C., 30 F.Supp. 3, 7, and United States v. Pendergast, D.C., 28 F. Supp. 601, 609. Petitioner also insists that the conviction was for an offense which was merely malum prohibitum and not malum in se and that absent a clear showing petitioner cannot be charged with moral turpitude within the meaning of the statutes and Supreme Court Rule.

We think the issue as to whether the conviction for the offense in question involves moral turpitude has been well settled in this State by numerous recent decisions of this Court which hold that a final judgment of conviction for the felony of willfully attempting to evade Federal income taxes by the filing of false and fraudulent returns denotes such moral turpitude as to disqualify one so convicted from continuing in the office of an attorney. In re McLendon, Mo.Sup., 337 S.W.2d 56, 61(3); In re Canzoneri, Mo.Sup., 334 S.W.2d 30, 33; In re Moon, Mo.Sup., 310 S.W.2d 935, 937; In re Landon, Mo.Sup., 319 S.W.2d 553, 557. In this case both the jury, who heard defendant testify concerning the charges against him, and the members of the Advisory Committee, who heard petitioner's testimony with reference to the same matters, disbelieved his testimony and refused to accept it against the charge of *willfully and knowingly attempting to evade and defeat income tax due and owing by him and his wife by filing false and fraudulent joint income tax returns*. Further, on the record presented here, we are unable to accept the petitioner's testimony that he did not know it was necessary to keep records of income and expenses for the purpose of making accurate income tax returns, nor can we accept his statement that he honestly believed that he could receive funds from the income of a business, which income would be classed as "a windfall" and not subject to income tax. A careful reading and study of petitioner's own testimony before the Advisory Committee necessarily leads to the conclusion reached by both the jury in the criminal case and the Advisory Committee in its hearing on the issues presented by petitioner's petition for disciplinary action. It further clearly appears that the returns filed were false and fraudulent.

Petitioner further insists that each case of disciplinary action must be governed by its own facts and that the good faith of petitioner in maintaining his disavowal of intent to evade taxes, the fact that full disclosure has been made, together with all the other facts in evidence must be given consideration, citing In re Burrus, 364 Mo. 22, 258 S.W.2d 625; In re Moon, supra;

In re Canzoneri, supra. It is true that each case must be governed upon its own facts, but we cannot accept petitioner's good faith in his disavowal of an intent to evade taxes where it is clear from the record that he has long refused to keep any record of his receipts or expenditures for the purpose of making an honest income tax return; and that absent such records there could be no disclosure of the true facts, nor can it be assumed that the government was able to definitely establish the actual receipts and expenditures of petitioner during the mentioned years. One who has engaged in the practice of law for some thirty-three years and maintained an office in Clayton, St. Louis County, can hardly be permitted to insist that he knew nothing about Federal income taxes or of any duty to keep records for the purpose of making accurate returns. Nor can we accept the petitioner's statement that he thought he could estimate or guess at the figures; and by so doing over-estimate his actual net income for income tax purposes.

Petitioner further insists that such derelictions as are shown by the record in this case were committed in his personal capacity and not in his professional capacity as an attorney, citing In re Burrus, supra; In re Landon, supra, 319 S.W.2d 553. We think it immaterial to any issues in this case whether the derelictions shown by the record were committed in his personal capacity or as an attorney since a jury has found the existence of such derelictions to be within the provisions of the statutes as having been made *willfully and knowingly for the purpose of attempting to evade and defeat income taxes by the filing of false and fraudulent income tax returns*. Further, the same conclusions were arrived at by the Advisory Committee who personally heard and saw the defendant as he testified in this cause. Clearly a conviction of the felony of attempting willful tax evasion by the filing of false and fraudulent income tax returns requires disciplinary action whether such offense be regarded as having been committed in a private or pro-

fessional capacity. In re Moon, supra, 310 S.W.2d 935, 938(3); In re Canzoneri, supra, 334 S.W.2d 30, 32(1, 2).

Petitioner further points out that the purpose of a disciplinary action is not to punish the attorney but rather to protect the public and those charged with the administration of justice, and that the facts in the instant case do not warrant any severe action such as recommended by the Advisory Committee. Petitioner refers to In re Connor, 357 Mo. 270, 207 S.W.2d 492; In re Williams, 233 Mo.App. 1174, 128 S.W.2d 1098; In re Burrus, supra; and In re Landon, supra, where it was pointed out that the purpose of disciplinary action is not to punish the attorney but rather to protect the public and those charged with the administration of justice; however, the cases cited do not support a finding that severe action should not be administered under the facts of this case.

Petitioner finally insists that his personal and professional conduct and reputation, both before and subsequent to his conviction, have been excellent and that such facts may be considered in deciding what action is appropriate under the facts of this case. This Court has so held in numerous cases, among them In re Moon, supra; In re Landon, supra; In re Canzoneri, supra. In this case the petitioner has presented the testimony of numerous citizens, attorneys, judges and businessmen who testified as to petitioner's excellent reputation in the community in which he has lived among the people that have known him both in his personal and professional capacities, and some of them have testified that his reputation was unaffected by the conviction in this case; however, few, if any, of them had any personal knowledge with reference to the facts of this case or of the record as made in the Federal court or as to the facts as testified to by the petitioner both as defendant in the Federal case and as petitioner in this cause. Giving due weight to all of the favorable character and reputation testimony as presented by petitioner, we are nevertheless and necessarily bound by the

record as presented to us, and on this record, we must and do find, from a careful review and consideration of the whole record, that a suspension rather than a disbarment would be adequate to protect the public interest. Accordingly, it is ordered that Philip A. Foley be suspended and prohibited from the practice of law in Missouri until the further order of this Court and that he will be permitted to apply to this Court for reinstatement, after the expiration of three years from the date of the adoption of this opinion, upon a showing that he is then a person of good moral character and fully qualified to be licensed as a member of the Bar of this State.

All concur.