In the Matter of the Honorable Louis M. KOHN, Judge, Respondent,

Missouri Association of Probate and Probate and Ex Officio Magistrate Judges, Intervenor.

No. 60559.

Supreme Court of Missouri, En Banc.

July 11, 1978.

Rollin J. Moerschel, St. Charles, David O. Danis, James M. Smith, St. Louis, for the Commission.

R. H. McRoberts, Bryan, Cave, McPheeters & McRoberts, Charles Alan Seigel, Stein & Seigel, Donald Gunn, Jr., St. Louis, for respondent.

Richard M. Webster, Webb City, for intervenor.

PER CURIAM.

In this disciplinary proceeding the Commission on Retirement, Removal and Discipline (Commission), under authority of Mo. Const. Art. V. § 27, and Rule 12,[1] recommends that respondent be suspended without pay from the office of Judge of the Probate Court of St. Louis County for a period of ninety days, because of judicial misconduct. Following notice of the charges, a five day hearing was held under Rule 12.08 which resulted in the Commission's findings and conclusions that respondent was guilty of certain of the acts of misconduct charged.

Mo.Const. Art. V, § 27, provides that the Commission, after hearing and by affirmative vote of at least four members, may recommend appropriate action and,

> the supreme court en banc, upon concurring with such recommendation, shall remove, suspend, or discipline any judge . . . for the commission of a crime, or for *misconduct*, habitual drunkenness,

---

1. All references to rules are to Supreme Court Rules unless otherwise indicated.

*willful neglect of duty*, corruption in office, incompetency or any offense involving moral turpitude, or oppression in office. (Emphasis added.)

The Commission adopted as a standard for measuring respondent's actions the "Canons of Judicial Ethics" set forth in former Rule 2, which governed such conduct prior to July, 1975, and present Supreme Court Rule 2, the "Code of Judicial Conduct",[2] as to acts occurring thereafter. Respondent and intervenor on the other hand argue for a narrow definition of the term "misconduct", as used in Art. V, § 27, contending that neither "Code" was intended to serve as a means for defining the language of the Article and thus may not be employed as the Constitutional standard for the discipline of judges. The restricted definition of "misconduct" insisted by respondent and intervenor would encompass only such acts as would necessarily lead to impeachment and removal. We find this contention without merit.

█ Although the grounds for discipline under Art. V, § 27(3) parallel those enumerated for impeachment in Art. VII, § 1, the new disciplinary scheme provides a far broader range of remedial action than proceedings under Art. VII. The adoption of present Art. V, § 27 in 1970, was clearly intended to permit corrective or disciplinary measures for acts of a less serious nature than those requiring removal. Further, this Court in its decisions involving judicial discipline under Art. V, § 27, has interpreted its terms against the Canons of Judicial Ethics and the Code of Judicial Conduct and in each instance has considered violations of the Canons or Code as evidence of

constitutional "misconduct" or other acts proscribed by the Article. See *In re Fullwood*, 518 S.W.2d 22 (Mo.1975); *In re Corning*, 538 S.W.2d 46 (Mo.1976) and *In re Duncan*, 541 S.W.2d 564 (Mo.1976).

Respondent and intervenor also argue the inapplicability of the "Code" or "Canons" for the reason that the Article makes no reference thereto.[3] The fact that § 27(3) as adopted contains no such reference, is not inconsistent with our ruling that violations of the Code may be considered evidence of misconduct, though not necessarily misconduct per se. It cannot be seriously questioned that the Code of Judicial Conduct, as well as the Canons of Judicial Ethics, serve as measures for both Commission and Court in judicial disciplinary proceedings and that evidence of judicial conduct in violation of the Canons or Code may be considered in determining whether particular acts complained of rise to the level of misconduct contemplated by Art. V, § 27(3).

Turning now to the principal issues at bar, the Commission has recommended suspension of respondent for acts of judicial "misconduct" and for certain acts that might be characterized as "willful neglect of duty." The charges which the Commission found were supported by the evidence include the following: (1) promulgation of overly rigid procedural rules and failing to allow sufficient staff discretion in their application; (2) failing to require courtesy on the part of court employees; (3) unreasonable delay in deciding cases under submission; (4) participating in ex parte communications affecting pending litigation; (5) adopting improper criteria when exercising the power of appointment, and (6) unneces-

---

**2.** Canons cited herein are from the present Code of Judicial Conduct, adopted as Supreme Court Rule 2, effective July 1, 1975. The former Canons of Judicial Ethics, effective March 1, 1967—June 30, 1975, will be cited as "former Rule 2.___."

**3.** In respondent's and intervenor's brief, appendices have been attached containing affidavits asserting as fact that the legislative committees which fashioned Art. V, § 27, struck from the language of subsection (3) any reference to the then Canons and Judicial Ethics. This matter was not developed in the testimony

nor does it otherwise appear of record. The proffered affidavits were not brought here under stipulation nor ordered as a supplement to the transcript and no opportunity has been afforded the Commission to cross-examine the affiants, accordingly the affidavits may not be considered evidence in the cause. See *State ex rel. Highway Commission v. Parker*, 388 S.W.2d 830, 832 (Mo.1965); *State v. Galeener*, 402 S.W.2d 336, 342 (Mo.1966); *State ex rel. Freeze v. The City of Cape Girardeau*, 523 S.W.2d 123, 127 (Mo.App.1975).

sary insulation of the judge from practicing attorneys.[4] For convenient reference these charges may be divided into two general categories: (1) administrative responsibilities and (2) judicial conduct.

## I. ADMINISTRATIVE RESPONSIBILITIES

The Commission found that respondent adopted unnecessarily rigid procedural rules and failed to allow his staff sufficient discretion to deal with minor variances or technical non-compliance with such rules; that those practices caused unnecessary appearances before the court by attorneys and litigants, with attendant delays and additional expense. Incidents supporting the Commission's findings extend through a period of time governed in part by former Rule 2.08 and later by Canon 3 B(1). Former Rule 2.08 provided that judges should

> organize the court with a view to the . . . convenient dispatch of its business and he should not tolerate abuses and neglect by clerks, and other assistants . . . .

Similarly, Canon 3 B(1) requires that a judge should

> diligently discharge his administrative responsibilities . . . and facilitate the performance of the administrative responsibilities of other . . . court officials.

Respondent has promulgated many rules[5] for the administration of affairs in the probate court of St. Louis County and among the exhibits here is a loose bound volume entitled "Practice in the Probate Court of St. Louis County" prepared by the School of Law and the University Extension Division, University of Missouri, Columbia, in cooperation with the probate court of St. Louis County. This volume contains eighty pages of procedural directives apparently distributed from time to time for the use and guidance of probate court functionaries. These include a number of orders spanning the period from June 27, 1967 through May 1, 1975. Also among the exhibits are the joint rules of practice adopted by the probate courts of St. Louis City and St. Louis County in 1973, consisting of one hundred thirteen pages.

The Commission determined that the number and rigid administration of these rules resulted in unreasonable "nit-picking" rising to the level of misconduct in the constitutional sense. It was testified that attorneys felt put upon by minutiae, wasteful of their time and costly to their clients. A number of incidents typifying these complaints are set out in the margin.[6]

---

4. A number of other charges were found unsupported by the evidence and an examination of the record convinces us that the Commission was justified in that determination. We need not burden this opinion with a discussion of those allegations.

5. It has been held that the probate courts have such inherent powers "as may be necessary to the proper exercise of their express powers." *In re Schield's Estate*, 250 S.W.2d 151, 156 (Mo.1952). While we need not decide the question, it may be argued that such courts have authority to adopt rules reasonably necessary for the administration of the business coming before them. The Commission raises no question as to the rulemaking power of the probate court.

6. A probate auditor, examining the semi-annual settlement in a decedent's estate, refused to accept as evidence of the payment of a municipal tax fill, the photocopy of both sides of a $14.00 check thereby delaying the settlement. However, this action was consistent with joint probate Rule 12.040 requiring that proof of payment of such claims ($500 or less) made without order of court be in the form of receipted itemized statements, not photocopies of canceled checks.

In another case, a Kirkwood attorney with offices twelve miles distant from the courthouse, requested by telephone that a probate clerk as an accommodation to him, deliver a summons, issued by the probate court, across the hall to the sheriff's office. He was told that the staff of the probate court was not permitted so to do and he must make other arrangements for delivery of the summons to the sheriff. This matter was brought to respondent's attention, and after consultation with the sheriff's office this uncooperative practice was discontinued.

Another attorney ran afoul an unwritten rule of the court that an order of refusal of letters would issue without production of a death certificate if the application for the order was prepared by the attorney in his office, but if the same petition was prepared in the probate court a death certificate would be required.

In addition to the matters discussed above, the Commission, in a separate count, found that respondent failed to exercise the administrative responsibilities of his office by not requiring his staff to extend courteous treatment to litigants, lawyers and others appearing before them. Canon 3 A(3) provides that a judge

> should be patient, dignified and courteous to litigants, . . . lawyers, and others with whom he deals in his official capacity, and should require similar conduct of lawyers, and of his staff, court officials, and others subject to his direction and control.

Former Rule 2.10, by similar language, governed such conduct prior to July 1, 1975.

Several instances of rudeness on the part of the probate court staff appear in the record. One attorney, when requesting a particular file from the court's records, was greeted with the question, "Why do you want to see it?" In another case, a mixup concerning the distribution of a decedent's assets through a trust occurred when the co-executor received conflicting advice from a probate law clerk and from the court commissioner regarding the proper course to follow. When the final settlement was not approved, the co-executor was directed to a court attache who discourteously stated that he (the co-executor) had succeeded in mixing things up and that he "ought to know better." In another instance, an attorney, when discussing a matter with respondent wished to examine the file involved, but the auditor, though requested, would not retrieve it. Finally, the court receptionist, when asked her name by the Commission investigator, told him it was her practice only to state her title or official position to those so inquiring and would not give the investigator her name.

■ Though the record demonstrates an often rigid and occasionally a discourteous attitude by court employees, it is not clear that complaints as to each of the incidents described were communicated to respondent. In several instances when such matters were brought to his attention, respondent sought to correct or ameliorate the

Procedural difficulties encountered by one attorney involved his petition in a decedent's estate for the continued employment of a *housekeeper* to protect valuables and to maintain the decedent's residence in presentable condition for showing to prospective purchasers. The petition was disapproved. Thereafter a new petition describing the same employee of the decedent's estate as a *guard* received the court's approval.

A complaint illustrating the strictness of the court auditors concerned a $7,000,000 estate, the settlement of which was delayed because of a $300 utility bill. It was insisted the bill be allocated between the portion relating to service received before and that received after the death.

An attorney handling a minor's guardianship estate in which the sole assets were the funds from the settlement of a personal injury claim petitioned for an order of no further process to eliminate the need for filing annual settlements and for payment of annual guardian bond premiums. Before the order would be approved, the court required that detailed and precise restrictions be placed on payments to the account. Although the attorney expressed his view that the court's auditors "were adversaries of lawyers practicing before the court," respondent offered a satisfactory, albeit somewhat technical explanation for these requirements.

In the estate of Grotpeter, complaint was made by an attorney who testified concerning the auditing and legal departments' refusal to approve the petition for certain repairs and termite inspection as to property sold pursuant to the directions of the will.

Another instance involved the complaints of an attorney for a decedent's estate who was required to make at least three trips to the courthouse to resolve a problem concerning an heir's refusal to receipt the bequest or cash a check of $1.00 constituting his distributive share of the estate. The problem was finally concluded by the attorney's filing a copy of his letter of transmittal, a copy of the receipt for registered mail and a copy of the check.

One practice of the court which the Commission did not explicitly recite in support of its findings was known to the Bar as the "four o'clock rule." Members of the court's staff generally refused to transact business or meet with attorneys after four in the afternoon. This conduct by the staff made absolute what is listed only as a suggestion in the joint probate court rules that attorneys bring in probate matters before that time of day. Respondent disputed how strictly the "four o'clock rule" was applied, but approved of it in principle as a means of providing a period of uninterrupted work time for his staff, especially the auditors.

problem. On the other hand, certain evidence indicates respondent was generally advised of his staff's behavior.[7] While we recognize how a plethora of rules and procedural directives may be a source of aggravation to the Bar and though we do not condone staff rudeness or an attitude of non-cooperation, we cannot find that respondent's elaborate system of rules nor his staff's often unyielding and sometimes arrogant application of those rules merit a finding of misconduct. It nevertheless behooves respondent, who is now fully apprised of such complaints, to correct these deficiencies and be as zealous in fostering a spirit of courteous staff cooperation with the Bar as he is in promulgating rules for the conduct of the court's business.

## II. JUDICIAL OBLIGATIONS

The remaining violations relate to respondent's personal conduct as judge of the probate court. We examine (1) two examples of respondent's undue delay in deciding cases taken under advisement, (2) allegations relating to ex parte communications, (3) improprieties in the appointment of an appraiser and (4) respondent's inaccessibility to attorneys.

Former Supreme Court Rule 2.07 required that "A judge should be prompt in the performance of his judicial duties . . . ." Former Rule 2.02 complemented that requirement by stating, "Courts exist to promote justice . . . their administration should be speedy and careful. . . ." Against the framework of these rules we discuss two flagrant cases of delay; the first involved the Cole estates. Margaret Cole died in 1953 (approximately nineteen years before the hearing in these matters), survived by her daughter Cheryl and her sister, Adeline Wilke, who was appointed executrix of Margaret's estate and guardian of Cheryl. Attaining her majority, Cheryl employed the firm of Campbell and Campbell to file exceptions to a number of settlements previously made by Adeline, both as executrix and guardian. The exceptions in these consolidated cases were tried in April of 1971. During the hearing of those cases Cheryl experienced mental distress and thereafter was adjudged incompetent. The Public Administrator, Patrick Fiandaca, was appointed her guardian and attorney Campbell continued to represent Cheryl as well as the guardian. Though Cheryl apparently experienced a mental breakdown during the trial, the hearing was completed in April, final briefs were filed and the case taken under advisement on May 28, 1971. Attorney Paul Kopsky, who represented one of the two bonding companies defending the case, was authorized after trial to represent both companies in settlement negotiations.

Sometime during the next six months, Mr. Campbell informed the court that settlement negotiations had failed. However, on October 7, 1971, Mr. Kopsky met alone with respondent and asked the matter be held up and that no ruling be entered because he, Kopsky, thought the case would be settled. Later that day respondent saw Mr. Fiandaca in the hallway of the courthouse and Fiandaca also suggested that the case could be settled.[8]

On May 17, 1972, one year after the case was taken under advisement, Campbell's firm forwarded to respondent a copy of a letter received from a Dr. Sandall, a staff

---

7. In December, 1972, the Commission Chairman advised respondent by letter of complaints the Commission had received concerning his court, including (1) unnecessary delays in conferring with clerks and auditors, (2) the "four o'clock rule", (3) disrespectful treatment of attorneys by the staff, and (4) the difficulty in arranging conferences with respondent. In the spring of 1973, an attorney appointed by the Commission to conduct an informal investigation of attorneys' complaints spoke with respondent of these and similar matters. This informal investigation terminated in 1973 without a finding of probable cause (required by Rule 12.08(a)) to initiate formal disciplinary proceedings. A second investigation in 1977 resulted in these proceedings.

8. Respondent's failure to advise Campbell of this ex parte conversation is in part explained by the fact that Fiandaca, as an attorney, would be expected to communicate these matters to Campbell and requires no disciplinary action.

psychiatrist of the St. Louis State Hospital, advising that he had been treating Cheryl Cole and that "it would be beneficial to the progress of her state if some decision is reached in the court case." Respondent apparently did not reply to this letter.

Thereafter respondent received two letters from attorney Campbell requesting that the case be decided. The first, in December, 1973, pointed out that a full stenographic transcript of the hearing had been made, referred to the Sandall letter Campbell forwarded in May, 1972, and advised respondent that the losing party would certainly appeal to the circuit court. Respondent well knew that neither party could appeal until a ruling was made. The second letter requesting action was sent to respondent by Mr. Campbell on July 15, 1974, stating:

My records indicate the above cases were taken under submission on May 26, 1971. As you are no doubt aware, a full transcript of the proceedings were made, and has been filed with the Court together with extensive memorandums of law. The cases now have been under submission for over three years. In the meantime, the movant-exceptor, Cheryl Ann Cole, has been adjudicated an incompetent. On a previous occasion, approximately one and a half years ago, our office advised you that the physician for Miss Cole was of the opinion that the continued pendency of this action was a factor aggravating her mental health.

Asking then that the matter be concluded, the letter ends,

In the event that you feel for some reason that you should not make a decision in the cases, I would request that you disqualify yourself and certify the matters to the Circuit Court.

Again we find no record of an oral or written response having been made to these letters.

In April of 1973, respondent had been interviewed by Donald Wolff, representing the Commission, concerning a complaint by Campbell regarding respondent's failure to decide the case. Respondent finally rendered his decision in the case in May, 1975, and an appeal was taken.

■ By way of explanation for this delay, respondent asserted that because he wished to avoid disrupting the relationship between Cheryl Cole and her aunt, he delayed his ruling in the hope that the case would be settled. While this may in part explain the delay in the early months the case was under submission, the delay of four years simply cannot be justified and must be characterized as misconduct under former Rules 2.02 and 2.07.

The second example of delay in deciding cases under submission involved the estate of *Sommerlath*. We do not recite the details except to note that respondent took twenty-one months to render his decision and we find respondent's proffered justification insufficient to excuse the delay. In mitigation, we note that in the large volume of court business (though contested cases constitute a minor portion of the work of the court), only *Cole* and *Sommerlath* demonstrate unreasonable delay. Considering the circumstances of the cases discussed here and in light of the volume of court business, we censure respondent for his misconduct or willful neglect of duty in these matters but do not order the suspension urged by the Commission.

■ The next act of misconduct found by the Commission concerns respondent's appointive powers. In this regard, former Rule 2.12 provided that appointees such as referees, guardians, etc., were to be selected "with a view *solely* to their character and fitness." (Emphasis added.) The Rule further states that the power of making such appointments should not be exercised by him "for personal or partisan advantage." Late in 1974, respondent directed that the name of an attorney be removed from the list of inheritance tax appraisers in the St. Louis County Probate Court, though he had served in that capacity from time to time for more than ten years, including periods before and after respondent assumed office. In March, 1975, the attorney inquired why his name was taken from the list. Respon-

dent replied that he had learned the attorney had voted against him in a confidential poll conducted by the Missouri Bar. In the hearing, respondent testified he had been informed of the attorney's Bar poll vote in late 1974, but that he had removed the attorney mainly because his work was not good and "he just wasn't doing the job." While the court should be given wide latitude in selecting such appointees, careful attention with the provisions of Rule 2.12 was required (after July, 1975, the Code of Judicial Conduct controls), but in this instance we do not believe that the Commission's finding of misconduct was sustained by the record.

The final allegation of misconduct with which we deal centers on the personal conduct of respondent in his dealings with attorneys appearing before the court. Former Rule 2.10 stated in part, "A judge should be courteous to counsel . . . and also to all others appearing . . . in the court." This theme is repeated in Canon 3 A(3) as follows: "A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity . . . ."

█ The Commission found Judge Kohn discourteous in that he was inaccessible and difficult to contact. Attorneys were required to work their way through an array of underlings, who insulated him from counsel, creating unnecessary delays in their work. The testimony of two witnesses support this finding. Numerous witnesses, including six presented by the Commission, testified they had no trouble arranging to see respondent, and seemed reconciled to the necessity for advance appointment. All witnesses testified that Judge Kohn's demeanor to them in personal contacts and in the courtroom was courteous. We find that the burden of showing violation of the Canons as to this charge was not met.

The Commission has moved to strike respondent's brief for failure to comply with the requirements of Rule 84.04. We overrule the motion.

Finally, the Commission report reflects that a number of the Commissioners considered removal appropriate in this case because of what they considered an intransigent attitude respondent demonstrated throughout the hearing as to any change in his behavior or the operation of the probate court. Accordingly we emphasize for the benefit of respondent that attorneys coming to the bar are officers of the court entitled to the courteous treatment expressed in the Canons from respondent and those in his employ. The bench must uniformly protect the dignity to which our brethren at the bar are justly entitled and it is unbecoming when jurists lose sight of the fact they have been practitioners of the law and remain active participants in this noble profession.

No member of the bench should long be permitted to conduct himself in a manner contrary to the Code. However, we trust respondent will reexamine the St. Louis County Probate Court Procedures and encourage the reasonable exercise of discretion of those in charge of their administration. We hardly need add that courteous and respectful treatment should henceforth be extended to all appearing in respondent's court, including those who testified on behalf of the Commission and cooperated in its investigation. Confident that conduct of the sort here censured will not recur, we direct that the disqualification imposed by Rule 12.07 during pendency of the Commission's recommendations to this Court be terminated.

MORGAN, C. J., and BARDGETT, FINCH, DONNELLY, RENDLEN and SEILER, JJ., concur.

SIMEONE, J., not participating because not a member of the Court when cause was submitted.