**In re William Y. FRICK, Respondent.**

**No. 65934.**

Supreme Court of Missouri,
En Banc.

Aug. 7, 1985.

Dale C. Doerhoff, Jefferson City, for Information.

R. Lawrence Ward, William E. Quirk, Thomas J. Whittaker, Kansas City, for respondent.

John J. Phillips, Independence, Brent J. Mayberry, Kirksville, Tom B. Brown, Edina, William D. Farrar, Kirksville, for amicus curiae.

## ORIGINAL DISCIPLINARY ACTION

WELLIVER, Judge.

■ The facts of this case tell the sad story of a lawyer who had an affair with a divorce client. He successfully dissolved her marriage but failed so miserably at dissolving the affair that the Advisory Committee of the Missouri Bar Administration has charged him with having engaged in conduct warranting disbarment. The Hon. Jack O. Edwards, Associate Circuit Judge, Twenty-Fifth Judicial Circuit was appointed as Special Master. A hearing was held and the master entered findings of fact and conclusions of law and recommended that respondent be disbarred. In a disciplinary proceeding we must review the evidence, the credibility, weight and value of the testimony of the witnesses, and decide all fact issues necessary to a decision. *In re Pine*, 576 S.W.2d 538, 539 (Mo. banc 1979); *In re Schiff*, 542 S.W.2d 771 (Mo. banc 1976); *In re Williams*, 233 Mo.App. 1174, 128 S.W.2d 1098, 1101 (1939).

The information contains three counts. In Count I, respondent is charged with anonymously engaging in a pattern of conduct designed and intended to harass his former client, "P", conduct which included writing anonymous letters to P, her friends, acquaintances, employer and others; and committing five acts of violence and vandalism against P and her property. Such conduct is alleged to be contrary to Missouri Supreme Court Disciplinary Rules DR 1–102(A)(3)(4) and (6). Count II charges respondent with disclosing confidential information received in a lawyer-client relationship, in contravention to Missouri Supreme Court Disciplinary Rules DR 4–101(B)(1) and (2). In Count III, respondent is charged with vandalism of a public building, pointing and then discharging a handgun at Security Personnel, and being found guilty of the felony of unlawful use of a weapon in violation of § 571.030(4). This conduct is alleged to be

contrary to Missouri Supreme Court Disciplinary Rules DR 1–102(A)(3)(5) and (6).

## I

On February 26, 1980, respondent met with and agreed to represent P in her dissolution proceeding. Although respondent was married, he sought to initiate an affair with P, and beginning on March 19 the couple engaged in sexual relations. In early August 1980, P moved from a central Missouri town where she formerly had resided and purchased a house in Kirksville, Missouri. On the 14th of that month, the couple met at the new house and celebrated the closing. During their celebration, P admitted to respondent that she had sexual relations with one D. This admission was apparently given in response to respondent's questions as to whether P had ever slept or had sex on a waterbed. The following week, on August 22, P's divorce settlement was finalized.

In October 1980, respondent separated from his wife, and the relationship between respondent and P warmed to the point that in November he moved into P's home in Kirksville. Respondent became friendly with P's teenage son, who was also living in the house, and took him fishing and hunting.

By late February 1981, their relationship was becoming increasingly unstable. P confessed to respondent that she had had a prior sexual encounter with another lawyer, R. As of mid-April, the affair had deteriorated to the degree that respondent was no longer living with P. During the ensuing months, respondent continued writing letters to P, P's son and to other relatives of P. He also wrote some business letters for P. Although P did not save all the letters written to her, she did save a number of the personal letters authored by respondent. These letters were admitted into evidence during the hearing before the special master. Some of the letters were mailed to P's home, while others were left under the windshield wiper of her car. Certain themes and characterizations run throughout these communications. Some of respondent's letters exhibit strong disapproval of P's dating men much younger than even herself. Respondent is approximately 30 years older than P.

We agree with the special master's finding that respondent's admitted letters went from pleasant to extremely hateful and vile as the relationship deteriorated. The master found:

[Respondent's] first letter in July, 1980, was addressed to "My dear, sweet P," and that same vein continued through February of 1981 when he opened with "My dear, sweet P." But after P terminated the relationship in March, 1981, he addressed her as "Dear P" or simply "Peggy" or "P". The only cordial greeting was in the July 8, 1981, letter to "Sweet P," but the content showed the same vile, hateful theme exhibited since March with more complaints about [her dating men younger than respondent and referring to one such person as the "kid"], a comment about the "cheap and tawdry things you have done," and prediction that in five years P's "looks will begin to go, those gorgeous breasts will begin to sag, the double chin and tenderloin will become permanent...." These later admitted letters are so vile and hateful the author must have intended to inflict extreme mental anguish upon the recipient.

After the March, 1981, break-up, respondent told P to leave town. In April respondent wrote: "My instincts tell me that you won't be in Kirksville much longer." There were also oral threats, including a threat against her if she reported respondent to the Bar.

Respondent's language in his letters to P also became coarser after March, 1981. In April he referred to her as a "midnite (sic) barroom pickup" and a "one hour punching bag," and said she was "debasing and degrading yourself." He reminded her of her one-night stand with D, knowing that this was an embarrassment to her.

The only positive note in respondent's letters after March, 1981, was his atti-

tude toward P's teenage son, J. Respondent commented about J frequently in his letters to P. He wrote at least two letters directly to J.

On October 23, 1981, P received an unsigned letter. From the content of the letter, P identified respondent as the author. The letter frightened P and on October 26 she called Harold Barrick, Chairman of the Missouri Bar Administration, and told him about her affair with respondent and about the letter. Mr. Barrick called respondent and warned him against contacting or writing P. After this conversation P received a number of other "anonymous" letters. The content and tone of these letters left no doubt in P's mind that respondent was their author. She saved some of the letters, but apparently a number of them either she or her roommate burned.

The master found that these letters were either written or typed, or caused to be written or typed, by respondent.[1] Only respondent knew *all* of the personal details, events and facts described in the letters, and the anonymous letters contained nicknames and "words and topics [that] were so much like those found in the admitted letters as to leave no doubt that respondent wrote all of the letters." The master also stressed the importance of other factors. First, P only recently had moved to Kirksville and her address was unlisted in the telephone directory. She knew only a few people in the city, one of whom was respondent, and all the letters were postmarked from Kirksville. Second, respondent often communicated with P by writing her letters. Third, the anonymous letters commenced after the letters admittedly written by respondent stopped; and the anonymous letters stopped after the police arrested respondent for a crime committed on April 13, 1982. Fourth, the anonymous letters contain themes found in the letters respondent admits to having written, such as exhibiting a concern for P's son and a

preoccupation with P's dating "kids" or "boys."

In general, the anonymous letters focus on the writer's disapproval of P's sexual activity, and the age of P's purported paramours. The letters are clearly debasing and riddled with vulgar words and descriptions. Some of the letters sought to intimidate P into moving. One letter, for example, ends with the following words of warning:

The next surprise will be soon. May be big or small. Tomorrow, next week or the week after, or maybe all three, but for sure. Some things will also happen that have never happened before and you wont ever know if they are surprises, but we will. A lot of your time will be taken up doing things you wont like and you will spend money you wont want to spend and we will know why. Think of it as the price you pay for being a slut. Do all your spring s____ real quick because you are gonna be very short on time very soon. You could just move out of our neighborhood ... It would be a very smart move for you. Youll come to it.

Anonymous letters also were received by third parties. They contain unfriendly and debasing comments concerning P. One letter was mailed to a fraternity and it suggested that the members should call P if they wanted to have "a good time."

There can be little doubt that the same person wrote all of the anonymous letters. The master observed correctly that, in addition to common words and topics, there are references in some letters to previous anonymous letters and also references to future anonymous letters.

The special master also found that the author of these letters engaged in the acts of vandalism directed toward P. Many of the anonymous letters discussed past acts of vandalism or foretold future acts. Specifically, the master found:

[S]ixteen of the letters referred to acts of vandalism already committed. Of even greater significance, however, is that

---

**1.** The typewriter used in the anonymous letters could not be found. No identification of respondent's fingerprints on any of the letters was effected.

nine of the letters predicted *future* acts of vandalism, and some predictions were so specific as to leave no doubt as to common responsibility (one letter predicted the vulgar word and even the color of the paint that appeared on the P house on March 3, 1982).

There are five separate reported incidents of vandalism. On November 17, 1981, the word "whore" was scratched in the paint on P's car and nails on wood blocks were placed under the tires of the car. On December 10, 1981, P's jeep was vandalized, with the word "whore" spray painted on the vehicle in various places. Eight days later the same word was spray painted on her house and a car parked in her driveway was vandalized. On March 3, 1982, the word "cocksucker" was spray painted on P's house, a rock was thrown through her bedroom window, and her porch light was painted red. Sometime thereafter, P's shrubs died from poisoning, a prediction in one of the letters. Other acts of vandalism were similarly predicted or described.

Then, on April 9, 1982, P received an anonymous letter that indicated "[t]here will be a lot more advertising for you next week. Look for it[.] How are the shrubs and the roof? Be patient. Enjoy your car while you can." The following week, on April 13, 1982, a person was observed spray painting P's name on a wall of the Science Hall tunnel on the Northeast Missouri State University Campus.

A University patrol interrupted the person painting the wall, and they pursued the individual when he began to run away. He turned and faced the two security men and, while pointing a gun, told them to "stand back and give me room." One member of the patrol was within five to six feet of the person, while the other was within ten feet of the suspect. The person fled, but the pursuit continued. The individual then turned around and at a distance of fifty to sixty feet fired the pistol at his pursuers. One of the security men, a former military man, said that he knew that the gun was pointed at them when fired because he saw the circle of fire that one observes when a gun is pointed and fired in the observer's direction. The security patrol identified respondent as the culprit. Respondent was charged with and found guilty of the crime of unlawful use of a weapon, § 571.030(4), a Class D felony. The Advisory Committee moved for suspension of respondent's license pursuant to Rule 5.20. The majority ruled that conviction under § 571.030(4) was not per se conviction of a felony "involving moral turpitude" as required by Rule 5.20. The conviction was affirmed on appeal and respondent has been denied relief under his 27.26 motion.

## II

■ Respondent maintains that he did not, in fact, commit the offense on April 13, 1982, although he stipulates to the fact of his conviction. He further claims that he did not commit any of the acts of vandalism or write any of the anonymous letters. Particularly, respondent argues that the special master erred in admitting into evidence the anonymous letters because they were not properly authenticated. This Court, and not the master, is the final arbiter of both the law and facts in this proceeding. We agree with the master that, in light of all of the circumstances, respondent either wrote or caused these letters to be written or typed. There can be no question as to their relevancy to this disciplinary proceeding. In this connection, it should be noted that several of the letters in question previously had been admitted into evidence at respondent's prior criminal prosecution.

## III

■ Respondent alleges that the master improperly ruled that he was collaterally estopped from "challenging certain evidentiary facts brought out in respondent's criminal trial, because these facts related to incidental conduct that was not essential to respondent's criminal conviction." Specifically, respondent challenges the fact that he was observed spray painting P's name on the University wall, arguing that he should not now be collaterally estopped

from denying and refuting this evidence. Respondent's contention is meritless for several reasons. The transcript of the criminal conviction, now final in all respects, is properly before this Court, not for the reason that guilt in this case must be grounded on guilt in the criminal case but rather for the reason that it is but one of the acts or circumstances in the course of conduct now charged against respondent by the Advisory Committee. There is no question of the admissibility of the spray painting in this proceeding. Neither before the master nor before this Court has respondent made an offer of proof to challenge, deny or refute the act. While we are not here reviewing the admissibility of this evidence in the criminal proceeding, we know of no reason why it would not have been admissible in that proceeding. Nor do we know of any reason why respondent should not be collaterally estopped from now challenging the prior admitted evidence. It was this act which must have suggested to respondent the need for the weapon which he subsequently used. The spray painting of the wall was the vandalism which was an inseparable part of the incident which led to respondent's conviction for "unlawful use of a weapon." There is no error, no preservation of the alleged error, and no evidence of prejudice to respondent by admission of the evidence of the spray painting of the wall.

### IV

■ While the preponderance of the evidence[2] establishes that respondent caused the anonymous letters to be written and that he committed various acts of vandalism leading up to his conviction of the class D felony, the determinative question is whether these facts support the violations charged in the information. At the outset, we dismiss Count II. Count II charges respondent with having disclosed the allegedly confidential information that P had sexual relations with D. Respondent obtained this information from P shortly before her divorce was finalized. We do not believe that this information was given in the lawyer-client relationship but rather in their personal relationship. This does not constitute a violation of DR 4–101(B)(1) and (2).

### V

■ Next, we consider respondent's argument that his conviction for unlawful use of a weapon was not illegal conduct involving moral turpitude under DR 1–102(A)(3). Respondent contends that "[t]his Court's earlier refusal to suspend respondent pursuant to Rule 5.20 implicitly adopted the view that the crime for which respondent was convicted does not involve moral turpitude." Rule 5.20 and § 484.240, RSMo 1978, authorize the automatic removal or suspension of an attorney upon the mere showing of a conviction of a crime involving moral turpitude. Respondent in effect argues that our prior ruling is res judicata. This argument overlooks the fact that, at most, our previous ruling decided only that the *mere fact of conviction* for unlawful use of a weapon is not *per se* conviction of a crime involving moral turpitude. *See generally* Annot. 21 ALR3d 887, 890 (1968). *Cf.* Schwartz, "Automatic Discipline—A Concept Whose Time has Arrived," 1981 Det. College of Law Review 1 (discussing rule for automatic suspension in New York and Michigan). At this stage of the proceeding, however, we are no longer concerned with the mere fact of conviction; rather, under *both* Counts I and III we must examine respondent's entire course of conduct. Unlike Rule 5.20, DR 1–102(A)(3) is not limited to a "conviction of a crime" involving moral turpitude, but rather encompasses "illegal conduct" involving moral turpitude. The circumstances surrounding an assault related crime may establish an offense involving moral turpitude. *See e.g. People ex rel. Colora-*

---

**2.** In a disciplinary proceeding, guilt must be proven by a preponderance of the evidence. *See In re Connaghan,* 613 S.W.2d 626, 628 (Mo. banc 1981); *In re Lowther,* 611 S.W.2d 1, 2 (Mo. banc 1981); *In re Weiner,* 547 S.W.2d 459, 561 (Mo. banc 1977); *In the Matter of Duncan,* 541 S.W.2d 564 (Mo. banc 1976).

*do Ass'n v. _____, Attorney at Law*, 88 Colo. 325, 295 P. 917 (1930); *In re Christakis*, 344 N.E.2d 852 (Ind.1976); *In re Vincent*, 282 S.W.2d 335 (Ky.1955); *State ex rel. Oklahoma Bar Ass'n v. Seelye*, 490 P.2d 1095 (Okla.1971); *In the Matter of McGrath*, 98 Wash.2d 337, 655 P.2d 232 (1982).

▇ "Moral turpitude" has been defined as "an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellowman or to society in general, contrary to the accepted and customary rule of right and duty between man and man; everything 'done contrary to justice, honesty, modesty, and good morals'." *In re Wallace*, 323 Mo. 203, 19 S.W.2d 625 (banc 1929). *See also Neibling v. Terry*, 352 Mo. 396, 177 S.W.2d 502 (banc 1944); *In re McNeese*, 346 Mo. 425, 142 S.W.2d 33, 34 (banc 1940). The moral delinquency may refer to nonprofessional conduct as well as conduct committed while acting in one's capacity as a lawyer. *In re Williams*, 233 Mo.App. 1174, 128 S.W.2d 1098, 1105 (1939). Courts invariably find moral turpitude in the violation of narcotic laws. *See e.g., The Florida Bar v. Linn*, 461 So.2d 101 (Fla.1984); *Matter of Thomas*, 472 N.E.2d 609 (Ind.1985); *Committee on Professional Ethics v. Shuminsky*, 359 N.W.2d 442 (Iowa 1984); *Matter of Discipline of Reutter*, 361 N.W.2d 68 (Minn. 1985); *Ohio State Bar Ass'n v. Orosz*, 5 Ohio A.2d 204, 449 N.E.2d 1310 (1983). *See generally* Annot. 99 ALR3d 277 (1980). Moral turpitude has also been found in crimes involving fraud and false pretenses. *See e.g., In re Schwartz*, 31 Cal.3d 395, 644 P.2d 833, 182 Cal.Rptr. 640 (1982) (false pretenses); *Matter of Anderson*, 474 A.2d 145 (D.C.App.1984) (false pretenses); *In re Scott*, 98 Ill.2d 9, 455 N.E.2d 81, 74 Ill.Dec. 51 (1983) (filing false tax return); *Louisiana State Bar Ass'n v. Whiting*, 425 So.2d 725 (La.1983) (false pretenses); *Attorney Grievance Comm'n of Maryland v. Mandel*, 294 Md. 560, 451 A.2d 910 (1982) (mail fraud); *Attorney Grievance Comm'n of Maryland v. Molovinsky*, 300 Md. 291, 477 A.2d 1181 (1984) (counterfeiting). Theft has been held to involve moral turpitude. *See e.g., In re Conduct of Carstens*, 297 Or. 155, 683 P.2d 992 (1984). Contributing to the delinquency of a minor has also been held to involve moral turpitude. *See Matter of Rabideau*, 306 N.W.2d 1, 102 Wis.2d 16 (1981), *appeal dismissed* 454 U.S. 1025, 102 S.Ct. 559, 70 L.Ed.2d 469.

▇ We believe that a preponderance of the evidence demonstrates that respondent did engage in illegal conduct involving moral turpitude. Respondent went to the university property carrying a handgun. When caught committing the act of vandalism, he used this gun to avoid capture. He deliberately pointed and then discharged the weapon in the direction of two individuals on security patrol. He knowingly placed these people in fear for their lives. The conduct described in Count III, the crime for which respondent was charged and convicted and the conduct immediately surrounding the crime, establishes a violation of DR 1–102(A)(3).

## VI

▇ Count I neither charges nor relies on conviction of a crime, but rather charges a course of conduct including the harassment, the reign of terror and intimidation, and the vandalism of P's property, all preceding the events of April 13th which are charged in Count III. Nothing in the record demonstrates that this course of conduct less involves the illegal acts and moral turpitude contemplated by DR 1–102(A)(3) than the acts committed the morning of April 13th. The writing of the anonymous letters, which purport to have been written by others, is clearly deceitful and dishonest, and constitutes a misrepresentation in violation of DR 1–102(A)(4).

## VII

▇ There remains to be decided the appropriate discipline. The purpose of these proceedings is not to punish the attorney; rather, the primary goal is protection of the public and the legal profession. *In re Randolph*, 347 S.W.2d 91, 109 (Mo. banc), *cert. denied*, 368 U.S. 916, 82 S.Ct.

196, 7 L.Ed.2d 132 (1961). Another court stated that "even if it is unlikely that the attorney will repeat the misconduct, certain acts by attorneys so impugn the integrity of the legal system that disbarment is the only appropriate means to restore public confidence in it." *In re Hughes*, 90 N.J. 32, 446 A.2d 1208, 1210–11 (1982). Some acts committed in a non-professional capacity may indicate such a lack of respect for the law and for other members of society that disbarment may be warranted.

In the defense of respondent a number of professional and lay character witnesses were presented. We agree with the special master that the testimony of these witnesses is of little relevance or help in these proceedings:

> The special master was impressed by the esteemed members of the Bench and Bar and persons from Mr. Frick's community who testified as character witnesses in his behalf. However, Mr. Frick's own conduct as to the particular charges brought is what is at issue here. The special master would like to be able to conclude that Mr. Frick's misconduct was a minor aberration. It was not. It was a cold, calculated, covert campaign of terror and intimidation brought by an attorney against his own client. This campaign was carried on for six months and only ceased upon the arrest of Mr. Frick.
>
> Evidence of good character is much more appropriate in regard to assessment of sanctions for discipline where the attorney has admitted to the misdeeds and shows some remorse. It is then helpful to fathom just what sanctions are most likely to preserve the in-

tegrity of the profession and protect the public. But where, as here, the accused stands in unbowed opposition to the administration of justice, though the evidence against him is far greater than that required by disciplinary proceedings, and no remorse is shown, evidence of otherwise good character is less of an aid in fashioning sanctions.

Critical to any opinion as to the appropriate sanction is a full knowledge of the conduct alleged and charged. The character witnesses who testified indicated that they were not familiar with the conduct charged in the information.[3]

■■■ In passing we note that in addition to those who testified, one hundred forty-two prominent individuals or couples and 68 lawyers affixed their signatures to instruments denominated to be "amicus curiae briefs," advocating acquittal of or leniency toward respondent. There is no evidence before us that any of these persons were more knowledgeable of the facts surrounding respondent's conduct than the character witnesses previously discussed.

It is unfortunate that recent cases,[4] including this case, indicate that there may be a growing belief that the Missouri judiciary will be responsive to appellate practice techniques much resembling the letter writing bombardments and the petition signing campaigns to which legislative bodies are subjected. We do not believe that the citizens of Missouri either expect or want a judiciary which responds to such practices. Nor do we believe that such practices have a place in the orderly administration of justice under the rule of law.

---

**3.** Respondent offered testimony of his fine reputation as a counselor and advocate and urges that we impose a sanction of requiring a certain amount of pro bono work. As we said in *In the Matter of Stephen W. Mendell*, 693 S.W.2d 76 (Mo. banc 1985), "[t]his evidence demonstrates with full force the personal tragedy involved, but does not overcome the manifest showing in the evidence nor does it mitigate the seriousness of the offense."

**4.** In *Sermchief v. Gonzales*, 660 S.W.2d 683 (Mo. banc 1983), approximately 115 associations and

individuals all clearly identified with and advocating for one side of the case, appeared denominating themselves as "amicus curiae" (friends of the Court). In the Application for Reinstatement of Donald M. Witte, (not reported), the Court was bombarded with 37 letters on behalf of the applicant, 19 being from members of the judiciary itself, 8 from lawyers, and 10 from prominent citizens in the area. In *In the Matter of Kohn*, 568 S.W.2d 255 (Mo. banc 1978), 32 letters were offered as an exhibit.

We have no difficulty in understanding and excusing what we believe to be the well-intentioned responses of those who are untrained in the law. It is no compliment to the Court, however, that there may exist within the profession those who believe that such tactics might influence the decision of the Court. Recognizing that there is an appropriate and legitimate use and function of amicus curiae briefs in our judicial process, we caution all that letter writing bombardments and petition signing campaigns are no part of that process and are not welcomed by the Court.

Respondent argues that while there may be no defense to his handling of his personal life, and regardless of how bad or how foolish the conduct may have been, nothing in the conduct affects his ability to practice law. We believe that we would be derelict in the performance of our duties to the public were we to say that those who would seek the advice and representation by lawyers must do so at the risk of being subjected to this type of conduct.

▮ The special master concluded that respondent's conduct "was not a minor violation of the law, it was a serious, gross violation of law. Even worse, this conduct was directly related to, or arose from malicious acts directed toward a client. [His] conduct has lessened public confidence in the legal profession." The length of time which respondent pursued the course of conduct, the intensity with which he pursued the course of conduct, and, his further pursuit of the course of conduct after warning by the Chairman of the Advisory Committee, could not do other than increase the resulting damage to the image of the legal profession. This, together with respondent's willingness to break the law and to place individuals in fear for their lives to prevent enforcement of the law, leaves us with no other alternative. We agree with the master that disbarment is the appropriate sanction.

Respondent is ordered disbarred.

HIGGINS, C.J., BILLINGS, J., BARRETT, HOUSER and SEILER, Sr. JJ., concur.

BLACKMAR, J., concurs in separate opinion filed.

DONNELLY and RENDLEN, JJ., not sitting.

ROBERTSON, J., not participating because not a member of the Court when cause was submitted.

BLACKMAR, Judge, concurring.

I concur in substantially everything that is said in Judge Welliver's thorough and careful opinion, and write separately only because of the public concern this case has aroused.

The principal opinion correctly points out that, when the matter of interim suspension was before us, the case had a very different aspect. I append a copy of an opinion I prepared and filed after the decision had been made, explaining my position. The views expressed are my own; I did not and do not purport to speak for the Court. It is significant that our order of February 23, 1983 specifically stated that the denial of suspension was "without prejudice to such informal and formal proceedings as the Advisory Committee may elect to institute...." [1] The Advisory Committee decided to wait until direct appellate review of the criminal proceeding had been concluded.

Now we have the entire case before us. I will not disagree with the dismissal of Count II, but observe that the respondent's misconduct had its inception in a professional relationship and that he blended his professional and personal activities in a most unfortunate way. The problem is with the totality of his conduct, from the time when his admitted letters reached unacceptable depths and continuing through the wall painting incident of April 13, 1982. I am in full agreement with the Master's

---

1. No member of the Court voted for immediate summary suspension. Those who expressed disagreement with the Court's order noted preference for a stay pending resolution in federal court of constitutional problems attending our Rule 5.20 (which I do not perceive).

finding that the respondent wrote, or caused the writing of, the anonymous letters, and was guilty of the enumerated acts of vandalism. His ultimate conviction is probative of his involvement in these matters, despite his denials. The circumstances are linked in an unbroken chain.

The respondent is not unfairly dealt with by the application of the doctrine of collateral estoppel. Even if we assume that the estoppel extends only to the bare facts charged in the information (quoted in my appended opinion), we may consider the sworn testimony in the criminal transcript for its bearing on both Count I and Count III. The respondent had the very best of representation and there was full opportunity for cross-examination. At the criminal trial he denied his guilt and his very presence at the scene, and so counsel may have had no particular reason to challenge the eyewitness testimony about what took place, but his present counsel could perfectly well have made an offer of proof before the Master as to any available evidence tending to refute any testimony at the criminal trial not involving identification. Nothing the Master said precluded such an offer, which is standard practice when evidence is excluded. The offer could have been renewed before us, and was not. I entertain no doubt that the wall was painted and the shot fired as described by the eyewitnesses, and that the respondent was the guilty party.

I also agree that the evidence shows, both under Count I and Count III, "illegal conduct involving moral turpitude," (DR1–102(A)(3)) and "conduct that adversely reflects on [the respondent's] fitness to practice law." (DR1–102(A)(6)). The defendant's conduct was protracted, gross, willful and malicious. He purposefully tried to inflict injury on "P". The rather narrow criminal charge on which he was convicted is only a part of the picture. The evidence which this Court believes shows other criminal violations, including assault [2] and what used to be called "malicious mischief".[3] Discipline is in order for personal misconduct as well as for dereliction of professional duty.[4]

I agree with Judge Welliver that petition signing contests and letter bombardments have no place in cases before this Court. Amicus briefs should impress with scholarship and logic and not with numbers; character witnesses should be distinguished by quality and familiarity rather than by quantity. I would not, however, fault the respondent or his counsel on account of the amicus briefs filed in this case. This case has generated public comment, emanating in part from people who should have remained silent. There was, at least to those sympathetic with respondent, the appearance of a clamor by the press and by politicians for his disbarment. There are lawyers who respect the respondent and clients who feel that he has served them well. Under these circumstances I can understand their desire to state their position. The so-called "amicus" briefs, furthermore, add little to the character evidence heard by the Master.[5]

What this character evidence shows is that the respondent is a capable lawyer who apparently continued his practice with minimal interference after he was apprehended and some of the sordid details established by the evidence were disclosed. If I were satisfied that the entire incident was safely behind him, I would hesitate to vote for disbarment. Punishment is for the criminal law. His conduct shown by the record, however, indicates that he is an unstable person who cannot be depended upon. Because of some quirk in his nature he responded to the breakup of an amatory

---

2.  *See* §§ 565.050, 565.060, RSMo 1978.

3.  *See* §§ 569.080(2), 569.090(1), 569.100(1), 569.-110(1), 569.120(1), RSMo 1978.

4.  *In re Conner,* 357 Mo. 270, 207 S.W.2d 492 (Mo. banc 1948); *In re Moon,* 310 S.W.2d 935 (Mo. banc 1958).

5.  A party should be solicitous of the Master's and opposing counsel's time, by limiting the number of character witnesses. It is quite usual, however, to obtain stipulations that other persons, if called, would testify as the character witnesses have.

interlude by a series of reprehensible acts, over a period of many months, culminating in violence directed against property and, finally, against persons. The character witnesses were skillfully cross-examined and showed only vague familiarity with the details of the respondent's conduct. These details militate against the disposition they request.

The respondent has given us no assurance that the causative factors in his errant behavior have been eliminated. He and his counsel of course face a dilemma when they admit only minimal involvement and deny the rest of the charges. They basically disclaim the existence of a serious problem. Now, when we find that the charges are established, the respondent must take the consequences. Our findings are such that he now has the burden of demonstrating his continued fitness to practice. I am not willing to allow him to continue in practice unless and until there is some assurance that the internal forces which caused the initial problem have been brought under control. The record provides no assurance whatsoever.

Mention should be made of the respondent's suggestion, through his counsel, that he be required to perform pro bono work as a sanction for such rule violations as the Court may find. The amici also endorse this suggestion. The proposal, however, is unacceptable. I heartily agree with counsel for the informants that a person who demonstrates such instability that he cannot be allowed to serve private clients may not be assigned to work for persons who have no freedom to choose counsel.

I agree that disbarment must be decreed.

### APPENDIX

### IN THE MATTER OF
### WILLIAM Y. FRICK

No. 64537

Nov. 2, 1983

### SEPARATE OPINION

Because of misunderstandings which have arisen and which have been widely publicized, I have prepared and have directed the Clerk to file this opinion, explaining my vote against summary suspension. It represents only my views, but is consistent with the position I advocated in conference and by memoranda while the matter was pending, and with the position of the majority of the Court. I now regret not having expressed these views on the record sooner, because I feel that communication promotes understanding.

Missouri's procedures for discipline of attorneys have been in place for many years. There is a two-level accusatory stage, with informal and formal hearings before the Advisory Committee or a Circuit Bar committee. If the Committee finds probable cause to believe that the Canons of Professional Ethics have been violated an Information is filed, customarily in this Court. If fact issues are presented, the Court appoints a Master to hear evidence and report, and the case is then briefed and argued before the Court. The procedure is designed to promote effective discipline, while affording the accused attorney the essentials of due process of law. It is often, unfortunately, time consuming. The procedure is set out in Rules 5.12 and 5.13.

Some lawyers, to our regret, run afoul of the criminal law. Final conviction of a crime is ground for disciplinary action. The Court may take the facts charged in the information or indictment as conclusive for disciplinary purposes once they are finally established by a criminal judgment. *In re Lurkins*, 374 S.W.2d 67 (Mo.1964). The convicted attorney will not be heard to say that he is not guilty of the offense of which he stands convicted. The attorney is entitled to offer evidence bearing on the sanction. Disbarment does not inevitably follow conviction. *In re Burrus*, 364 Mo. 22, 258 S.W.2d 625 (banc 1953)—one-year suspension for conviction for willful failure to file income tax, although the Court found that the offense involved "moral turpitude"; *State v. Owen*, 258 S.W.2d 662 (Mo.1953), conviction of the felony offense of "flourishing" a weapon in violation of

§ 564.610, RSMo 1949, followed by a reprimand. The sanction is determined by the Court and is based on the circumstances of the case.

"Conviction" for disciplinary purposes has traditionally been defined in this state as final conviction, after all avenues of appeal have been exhausted. *State ex rel. Larew v. Sale*, 87 S.W. 967, 969 (Mo.1905). This meant that there were often long delays during which an attorney stood publicly convicted of a serious crime, but could continue to practice law while the appeal processes ran their course.[1] To meet the problem as thus described this Court, in 1973, adopted Rule 5.20, providing as follows:

> Upon receipt of information from The Advisory Committee or a Circuit Bar Committee that an attorney admitted to practice in Missouri has been convicted of a crime involving moral turpitude, whether the conviction resulted from a plea of guilty, nolo contendere or from a verdict after trial, this Court shall cause to be served on said attorney an order to show cause why said attorney should not be suspended from the practice of law pending the final disposition of any disciplinary proceeding based upon such conviction or misconduct which resulted in conviction. The pendency of an after-trial motion or an appeal shall not be a basis for delaying the entry of an Order of Suspension.

> If an Order of Suspension based upon such conviction is entered and thereafter the suspended attorney files a certified copy of the order of a Court reversing the finding of guilty, this Court shall immediately enter an order reinstating said attorney unless he is under suspension or disbarred as a result of having been found guilty of professional misconduct in a disciplinary proceeding. Such reinstatement shall not bar prosecution

in a disciplinary proceeding nor automatically terminate any disciplinary proceeding then pending against the attorney.

> If the conviction is affirmed on appeal, the Committee shall file with the Court a motion to discipline, together with a certified copy of the judgment, whereupon the attorney shall be subject to discipline by the Court without the requirement of a proceeding before The Advisory Committee or any Circuit Bar Committee.

This rule sought to effect a compromise between the interests of the accused attorney and those of the public. It provides for interim suspension, and properly treats the underlying conviction as establishing a probability of correctness sufficient to justify summary action. The rule does not provide for an automatic suspension, but rather provides for an "order to show cause," to be served on the attorney. The rule, furthermore, made use of a phrase with substantial history, in requiring a showing of a "crime involving moral turpitude." In using this phrase, the Court may have adopted a narrower rule than that which the American Bar Association recommended, in which the phrase "serious crime" was used. Whatever the reason, however, the rule did not by its terms authorize interim suspension for all crimes, or even for all felonies.

On October 21, 1982 the respondent was found guilty and received a suspended sentence of one year, under an information charging the following:

> The Special Prosecuting Attorney of Adair, State of Missouri, charges that the defendant, in violation of § 571.030, RSMo 1981, Cum.Supp., committed the Class D felony of unlawful use of a weapon, punishable upon a conviction under § 558.011(4) and 560.011, RSMo., in that on April 13, 1982, in the County of Adair, State of Missouri, the defendant knowingly exhibited, in the presence of one or more persons, a weapon readily capable of lethal use in an angry or threatening manner.

---

**1.** The disciplinary authorities are not required to wait until the criminal processes are exhausted. *In re Richards*, 333 Mo. 907, 63 S.W.2d 672 (banc 1933). They may initiate proceedings independently, but, if doing so, must establish the facts in an evidentiary hearing. Because of the duplication of effort, it is usual to abide the result of the criminal action.

On November 4, 1982 the General Chairman of the Advisory Committee filed in this Court an Information under Rule 5.20, asserting that the respondent has been convicted of a "crime involving moral turpitude," and asking that he be required to show cause why he should not be suspended pending appeal of his conviction. The Court promptly issued an order to show cause.

A return was timely filed by the respondent through his counsel, R. Lawrence Ward, Esq., a lawyer of outstanding reputation and President of the Kansas City Bar Association. He filed a brief asserting that the offense charged did not involve moral turpitude, and furnished copious citations of authority.[2] On January 12, 1983, the Court directed the Advisory Committee to respond to the return, which it did in the form of a memorandum of law filed by its staff attorney, and respondent's counsel filed a reply brief. The issue was then before us for decision, with the benefit of able briefing on both sides.

The transcript of the trial was not then available. The Committee did not ask the Court to go beyond the formal record, consisting of the information and the Circuit Court's judgment of conviction. It argued that these documents established conviction of an offense involving moral turpitude, and that no hearing was necessary. The respondent argued, just as strongly, that the offense did not involve moral turpitude.

The issue before us, then, was whether the offense charged involved "moral turpitude." Unless this question can be answered in the affirmative, there is no basis in the rule for an interim suspension. I studied the cases cited in the briefs and was persuaded that offenses of the kind described in the information have not traditionally been included within that phrase, in the numerous cases which have considered the point. The Advisory Committee cited only one case for its position, and that involved a much more serious offense.[3] It is reasonable to assume that this Court, when adopting Rule 5.20, intended that the frequently used phrase be construed as it had been construed historically.

The Advisory Committee argued that the Court, in the past, has always concluded that any felony necessarily involves moral turpitude within the meaning of Rule 5.20. I can find no indication that the Court ever had before it a case even close to this one factually, in determining the meaning of "moral turpitude,"[4] or that it analyzed the meaning of the phrase in any recorded decision applying the rule. Had the Court in adopting Rule 5.20 intended to authorize summary interim suspension for conviction of any felony, it would have been easy to say so.

Whether Rule 5.20 should now be amended to substitute "felony" for "moral turpitude,"[5] or to provide "felony or offense

2. Cited were Annotation 21 A.L.R.3d 887, 890 (1968) and recent cases including *Attorney Grievance Commission v. Klauber,* 283 Md. 597, 391 A.2d 849 (1978); *The Florida Bar v. Cohen,* 191 So.2d 49 (Fla.1966); *The Florida Bar v. Ragano,* 270 So.2d 3 (Fla.1972). The Advisory Committee did not respond to nor make any attempt to distinguish the cases cited by the respondent.

3. The Committee cited *Oklahoma Bar Association v. Seelye,* 490 P.2d 1095 (Okla.1971), involving a conviction and five year sentence for assault and battery with a dangerous weapon. The severity of the sentence shows that the case was a serious one. More important for present purposes, however, is that the attorney did not contest the disciplinary proceedings, so that a studied decision was not required. Nor did the

disposition depend on a finding of "moral turpitude."

4. The case is the first Rule 5.20 case I have participated in, but nobody called my attention to any case in which the Court construed the phrase "moral turpitude" as used in this rule. The Advisory Committee cited a case in which a lawyer was charged with filing and collecting a false claim against the federal government, and this offense would seem to be within any definition of "moral turpitude."

5. New York imposes automatic disbarment by statute, following conviction of a felony. *Mitchell v. Association of the Bar of the City of New York,* 40 N.Y.2d 153, 386 N.Y.S.2d 95, 351 N.E.2d 743 (1976), cited by the Advisory Committee. Action under this statute is not prece-

involving moral turpitude," on the thought that some non-felony offenses might fall within the latter category, (*Cf. In re Burrus, supra*) is entirely appropriate for consideration, but the interim suspension of the respondent must find its justification within the four corners of the present rule, and not on one's ideas about what the rule ought to be. One thing to consider is that the Court, in the past, has declined to order any suspension at all in at least one case in which there was a conviction of a felony which was the direct predecessor of the offense charged against the respondent. *State v. Owen, supra.*

One purpose of Rule 5.20 is to permit the interim suspension of a lawyer following conviction of an offense which, if the facts charged are finally established, is such that disbarment would undoubtedly follow. Offenses in this category include perjury, obstruction of justice, extortion, making of false claims, and tax evasion. The great majority of courts which have passed on the issue do not consider that offenses of the type charged against this respondent involve moral turpitude, viewing them as offenses of passion or transitory delinquency rather than as demonstrating depravity of character. Perhaps the Court had a distinction of this sort in mind when it framed Rule 5.20. Perhaps there was a feeling that there should not be an interim suspension except in a case in which substantial suspension or disbarment would be highly likely on final conviction.

Some members of the Committee complained that the Court did not sufficiently explain the reasons underlying its decision. It should be evident that the decision was reached after consideration of the issues briefed. I have now tried to explain my thinking about the issues presented, but do not purport to speak for other members of the Court.

Interim suspension is a drastic thing, to be ordered only when strictly authorized by the rules. Based on my study of the

briefs, I simply could not vote for interim suspension. We must never allow considerations of expediency, or fear of adverse publicity, to prevail over our considered view of the law, based on study of the authorities. Some of my brothers may take a different view of the law. This is, of course, their privilege, but, once I reached a judgment as to the requirements of the law, my duty was clear.

The respondent has not been "immunized" on account of the offense of which he was convicted. If the conviction is affirmed on appeal then the responsible authorities may use the conviction as the basis for proceedings under Rules 5.12 and 5.13. Or they may proceed under these rules at any time without reference to the criminal proceedings.

CHARLES B. BLACKMAR, Judge

for perjury and obstruction of justice.

dent for proceedings under our very different rule. The particular case involved conviction